490 F.2d 1334
 Fed. Sec. L. Rep. P 94,356
INTERNATIONAL CONTROLS CORP., Plaintiff-Appellee,
v.
Robert L. VESCO et al., Defendants, and Andean Credit, S.A.,
Intervenor-Appellant.
INTERNATIONAL CONTROLS CORP., Plaintiff-Appellee,
v.
Robert L. VESCO et al., Defendants, and Fairfield General
Corporation et al., Defendants-Appellants.
INTERNATIONAL CONTROLS CORP., Plaintiff-Appellee,
v.
Robert L. VESCO et al., Defendants, and Vesco & Co., Inc.,
Defendant-Appellant.
 Nos. 462, 463, 539, Dockets 73-2202, 73-2255, 73-2568.
 United States Court of Appeals, Second Circuit.
 Argued Dec. 10, 1973.
Decided Jan. 15, 1974.
 
 A. Dennis Terrell and Matt A. Farley, Newark, N.J. (J. William Barba, Shanley & Fisher, Newark, N.J. on the brief), for defendants-appellants Fairfield Gen. Corp., Fairfield Aviation Corp., and Skyways Leasing Corp.
 Laurence B. Orloff, Newark, N.J. (Gary S. Freedman, Hannoch, Weisman, Stern & Besser, Newark, N.J., Arum, Friedman & Katz, New York City, on the brief), for defendant-appellant Vesco & Co., Inc.
 Arthur H. Christy, New York City (Robert S. Appel, David P. Steinmann, Christy, Frey & Christy, New York City, on the brief), for intervenor-appellant Andean Credit S.A.
 Milton S. Gould, C. Leonard Gordon, and Sheldon D. Camhy, New York City (Daniel L. Carroll, Shea Gould Climenko & Kramer, David M. Butowsky, New York City, on the brief), for plaintiff-appellee.
 The Securities and Exchange Commission, Washington, D.C. (David Ferber, Sol., Robert E. Kushner, Asst. Gen. Counsel, Alan J. Blank, Sp. Counsel, and David K. Ginn, Atty.), as amicus curiae.
 Before KAUFMAN, Chief Judge, and MANSFIELD and MULLIGAN, Circuit judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 A mere glimpse into the multifarious financial manipulations of Robert Vesco reveals a web of corporate and personal transactions of astonishing intricacy. Although the appellants before us do not include Mr. Vesco, himself, who we note parenthetically has refused to return to the Southern District of New York[1] and seems to be safely ensconced in Nassau, the Bahamian capital, beyond the reach of the United States,[2] we cannot ignore his pervasive presence in the litigation which precipitated these appeals. Having allegedly utilized appellee International Controls Corp. (ICC) as a financial source and vehicle for his purported securities manipulations, Vesco, and his individual and corporate associates, have now become the objects of ICC's strenuous efforts to recover whatever assets remain-- assets ranging from, (1), a Boeing 707 aircraft, owned by appellant Skyways Leasing Corp., a wholly-owned subsidiary of appellant Fairfield Aviation Corp., in turn wholly-owned by appellant Fairfield General Corp. (Fairfield Group), to (2), 846,380 shares of ICC common stock transferred by Vesco and his children to appellant Vesco & Co., Inc. (Vesco & Co.), to (3), a pleasure yacht, the Patricia III, which, although used exclusively by Vesco and his family, is claimed by intervenor-appellant Andean Credit S.A. (Andean). Thus, we are asked by appellants Fairfield Group, Vesco & Co., and Andean, in three separate appeals, to review the propriety of preliminary injunctions issued by Judge Stewart restraining the disposition of these various assets claimed by ICC, injunctions which, with some modification, we affirm.
 
 I. INTRODUCTION
 
 2
 On November 27, 1972, the Securities and Exchange Commission (SEC) filed a complaint in the Southern District of New York, SEC v. Vesco et al., 72 Civ. 5001, against 42 individual and corporate defendants[3] alleging a scheme of extraordinary magnitude, deviousness, and ingenuity in violation primarily of the anti-fraud provision of the Securities and Exchange Act of 1934 (1934 Act), Section 10(b) (15 U.S.C. 78j(b)), and Rule 10b-5 (17 CFR 240.10b-5). In brief, the SEC charged that Robert Vesco masterminded and, with his cohorts, implemented a plan involving the manipulation of the assets and securities of a number of corporations controlled by Vesco including ICC, also a defendant in this SEC suit. In the course of this purported scheme, Vesco and his group were alleged to have defrauded the public investors in ICC, as well as investors in four mutual funds, managed by subsidiaries of IOS, Ltd., a corporation which had been acquired by ICC, through the creation of a number of corporate entities and the subsequent transfer to these corporations of the assets of ICC and the mutual funds. The SEC asserted that as a result of this elaborate shell game, clothed in the garb of securities transactions, Vesco and others had secured control of over $200 million deposited in banks located in countries ranging geographically from Luxembourg to Costa Rica. The complaint closed with a prayer for permanent injunctive relief against future violations and a demand that receivers be appointed for several defendant corporate vehicles, including ICC.
 
 
 3
 On March 16, 1973, ICC, without admitting or denying the allegations in the Commission's complaint, consented to the entry of final judgment against it in the SEC action.[4] Pursuant to this consent judgment, ICC was permanently enjoined from future violations of the Securities Exchange Act. Judge Stewart further ordered that, in lieu of the appointment of a receiver sought by the SEC, a Special Counsel and a new interim board of directors be appointed by the Court to represent ICC. The order provided that
 
 
 4
 Special Counsel shall have the power and be directed to (inter alia):
 
 
 5
 . . . .nse
 
 
 6
 (b) take all appropriate action, including but not limited to, the institution and prosecution of suits on behalf of International Controls to recover all assets or monies improperly used, taken, wasted, misappropriated, dispensed, obligated or paid to anyone (i) without appropriate authorization, approval or ratification of the board of directors of International Controls or (ii) in breach of duties owed to defendant International Controls or its subsidiaries by present or former officers, directors or employees of International Controls or any other person. The Special Counsel shall consult with plaintiff Commission and the board of directors of International Controls in the resolution of all claims International Controls may have. He shall neither decline to pursue any claim . . . nor settle any claims against the recommendation of plaintiff Commission and without the approval of this Court;
 
 
 7
 . . . . de
 
 
 8
 (d) pending the investigation and accounting by the Special Counsel, he shall take immediate, necessary or appropriate action to protect International Controls' claims, interests and rights and pursue all possible claims against the defendants herein or any other persons including, but not limited to, the commencement of legal proceedings to prevent the dissipation or flight of any funds or other assets, the placing of a stop transfer order on securities beneficially owned or controlled by said defendants and/or the institution of appropriate action to freeze and preserve the assets of said defendants or others who may be obligated to International Controls . . ..
 
 
 9
 The order also provided that the newlyappointed board of directors 'shall replace the existing board of directors of International Controls, and shall have full power under applicable corporate law to conduct the affairs of International Controls in conjunction with the Special Counsel . . ..'
 
 
 10
 Given this mandate, Special Counsel David Butowsky, on June 7, 1973, filed a complaint on behalf of ICC against 32 individual and corporate defendants,[5] 22 of whom were defendants in the pending SEC action, and 10 of whom, including Vesco & Co. and the Fairfield Group were not. The complaint contained eleven 'counts' alleging various violations of the 1934 Act, principally of Section 10(b) and Rule 10b-5, and charged fraud, self-dealing, waste of corporate assets and breach of fiduciary duty. Much of the complaint paralleled the SEC's charges of securities manipulation by Vesco and his associates at the expense of ICC and its stockholders. The Fairfield Group, the ICC complaint alleged, had been the vehicle for the diversion of ICC's assets in the form of a Boeing 707 aircraft, purchased and leased to ICC by Skyways at a time when Skyways was a wholly-owned subsidiary of ICC. ICC charged also that Vesco had caused ICC to spend over $1 Million in refurbishing the plane, including the installation of a discotheque and sauna for Vesco's private use, and that Vesco and certain other directors of ICC had fraudulently induced the remaining ICC directors to approve a dividend in kind of ICC's stock in the Fairfield Group, thereby establishing the Fairfield Group as corporate entities independent of ICC. Appellant Vesco & Co. was referred to in the complaint only once and quite simply as 'a Delaware corporation to which defendant Vesco and his children have transferred certain of their assets.'
 
 
 11
 Since Robert L. Vesco, the principal orchestrator of the alleged fraud, had already fled the United States and resisted efforts to induce him to return, ICC moved quickly to prevent the dissipation of assets to which it would be entitled if its lawsuit should be successful. Accordingly, ICC first obtained temporary restraining orders and then, on July 3, 1973, secured preliminary injunctions against Vesco & Co. and the Fairfield Group. Vesco & Co. was enjoined from disposing of the 846,380 shares of ICC common stock and from prosecuting a pending state court derivative suit instituted by Vesco & Co. on behalf of ICC against certain former and current directors of ICC. The Fairfield Group was similarly enjoined from selling the Boeing 707 and from prosecuting two actions against ICC, filed in New Jersey Superior Court, for failure to continue payments under the Boeing 707 lease between ICC and Skyways, and to recover books and records of the Fairfield Group in the possession of ICC. Finally, after ICC had secured a temporary restraining order against Vesco restraining the removal from its Miami berth of the yacht, Patricia III, used and allegedly owned by Vesco, the appellant in the third appeal before us, Andean Credit, intervened, claiming ownership of the yacht and seeking, therefore, to have the temporary restraining order dissolved. After an evidentiary hearing before Judge Stewart, the temporary restraining order ripened into a preliminary injunction, issued October 5, 1973, restraining Andean from removing the yacht from its berth.
 
 
 12
 Having sketched the broad outlines of the litigation resulting from Vesco's extraordinarily complex manipulations, and which spawned the three appeals before us, we can now turn to the specific claims asserted by each appellant. Although of common origin, each appeal rests on factual and legal contentions sufficiently different to warrant separate discussion.
 
 II. THE FAIRFIELD GROUP APPEAL
 
 13
 The factual basis for the preliminary injunction issued against the Fairfield Group is not disputed. Thus, Judge Stewart did not find it necessary to hold an evidentiary hearing as a predicate to granting injunctive relief. See SEC v. Frank, 388 F.2d 486 (id Cir. 1968). On its part, ICC filed four affidavits in support of its motion: (1) by David Butowsky, Special Counsel; (2) by Allen Shinn, a court-appointed director and President of ICC; (3) by Laurence B. Richardson, Jr., former President, Chief Operating Officer and director of ICC; (4) by Malcolm McAlpin, a former director of ICC. In response, the Fairfield Group submitted an affidavit by Joel M. Grady, President of Skyways and Fairfield Aviation, Executive Vice President of Fairfield General, and a director of all three corporations.
 
 
 14
 Our examination[6] of these affidavits reveals the following salient facts. On June 15, 1971, Skyways, then a wholly-owned subsidiary of Fairfield Aviation, which, in turn, was a wholly-owned subsidiary of ICC, purchased a Boeing 707 jet aircraft from Pan American World Airways, Inc. for $1,375,000. Thereafter, on October 1, 1971, Skyways leased the plane to ICC for a five-year period for an approximate gross rental of $3,500,000. This lease also provided that, upon five days notice, Skyways could terminate the lease should it desire to sell the aircraft and that all improvements to the aircraft would remain the property of Skyways. This lease was not submitted to the board of directors of ICC for approval until December 8, 1971.
 
 
 15
 During the six-month period from June to December 1971, ICC spent $600,000-$700,000 to refurbish the plane. These improvements, however, were not of the sort generally associated with business purposes but rather, suited the personal comforts, conveniences and zest for living of the primary user of the 707, Vesco.
 
 
 16
 On November 19, 1971, ICC incorporated Fairfield General as a whollyowned subsidiary. Subsequently, on December 8, 1971, at a board of directors meeting crucial to the alleged fraud, the ICC board first approved the transfer if ICC's Fairfield Aviation stock to Fairfield General, in return for additional stock in Fairfield General and second, voted to issue all of the Fairfield General stock to the shareholders of ICC as a dividend in kind. Both Richardson and McAlpin, members of the board of directors on December 8, stated in their affidavits that, at the time of this meeting, they had not been informed either of the improvement expenditures or of the termination and ownership of improvements provisions of the Boeing 707 lease and, had they known of these facts, they would not have approved the dividend of the Fairfield General stock.
 
 
 17
 Based on the foregoing facts, ICC claims in its complaint that it was fraudulently deprived of the Boeing 707 aircraft since, as a result of the spin-off of Fairfield General and its whollyowned subsidiaries, Fairfield Aviation and Skyways, that asset is no longer under its control. Moreover, in exacerbation of this loss, ICC contends that it remains obligated to Skyways under the oneruos 707 lease. ICC claims that the motive for the spin-off was Vesco's concern that he might lose control over ICC and, as a consequence, be forced to relinquish his personal use of the 707. Accordingly, to foreclose that eventuality, Vesco sought to shelter the aircraft in a corporate shall free from ICC's control, a corporation such as Fairfield General in which all of the directors were Vesco associates.[7] ICC concludes its complaint by praying, inter alia, that the fraudulently induced dividend of Fairfield General stock be declared null and void.
 
 
 18
 The Fairfield Group responded by filing a motion to dismiss the complaint, asserting a lack of subject matter jurisdiction under the 1934 Act. They urged that while ICC may have stated a claim of internal corporate mismanagement, it had not stated or proved a claim cognizable under Section 10(b), the only section of the 1934 Act relied on by ICC, and Rule 10b-5 thereunder. Absent subject matter jurisdiction under the 1934 Act, moreover, the Fairfield Group contended that the suit must be dismissed as to them because, as New Jersey corporations doing no business in New York, service of process could only be valid under the provision for nationwide service of process, 15 U.S.C. 78aa, if the 1934 Act were applicable.
 
 A. Subject Matter Jurisdiction
 Under Section 10(b)
 Section 10 of the 1934 Act provides:
 
 19
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 
 
 20
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 
 Rule 10b-5 of the Commission provides:
 
 21
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,(a) To employ any device, scheme, or artifice to defraud,
 
 
 22
 (b) To make any untrue statement of a meterial fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 
 
 23
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 
 
 24
 in connection with the purchase or sale of any security.
 
 
 25
 It is now well-settled that the failure or refusal of a majority of a board of directors to disclose to the remaining directors pertinent information, as Richardson and McAlpin claimed was the case concerning the dividend of Fairfield General Stock, constitutes a 'fraud' upon ICC within the meaning of section 10(b) and Rule 10b-5. Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964). The critical question remains, however, whether that 'fraud' was perpetrated on ICC 'in connection with the purchase or sale of any security.' Haberman v. Murchison, 468 F.2d 1305 (2d Cir. 1972); Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970); Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1962).
 
 
 26
 ICC contends that its exchange of Fairfield Aviation stock for Fairfield General stock constituted the requisite 'sale.' Although the definition of 'sale' under the 1934 Act is indeed a broad one-- including 'any contract to sell or otherwise dispose of' (15 U.S.C. 78c(a)(14))-- we cannot agree that by transferring its ownership of Fairfield Aviation to its wholly-owned subsidiary, Fairfield General, ICC in any sense 'disposed of' its Fairfield Aviation stock. Quite simply, as long as ICC retained sole ownership of Fairfield General, it retained complete control over Fairfield Aviation and thus relinquished nothing in the exchange. Accordingly, that self-dealing transaction does not appear to satisfy the 'purchase or sale' requirement of 10(b) and Rule 10(b)-5. Cf. Blau v. Mission Corp., 212 F.2d 77, 80 (2d Cir.), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954);[8] In re Penn Central Securities Litigation, 347 F.Supp. 1327, 1333-1339 (E.D.Pa.1972).
 
 
 27
 ICC also suggests that its dividend in kind of the Fairfield General stock represented a 'sale' under the relevant statute and rule. It urges us to follow a recent line of cases holding that such subsidiary spin-offs constitute 'sales' for purposes of the Securities Act of 1933 (1933 Act), 15 U.S.C. 77a et seq., thus requiring a registration statement to be filed covering the subsidiary's shares, as in fact Fairfield General did file in this instance.[9] SEC v. Datronics Engineers, Inc., 490 F.2d 250 (4th Cir. 1973), petition for cert. filed, 42 U.S.L.W.L.Rep. P94,334, 3388 (U.S. Dec. 27, 1973) (No. 1011); SEC v. Stern-Haskell Inc., (Current Volume) CCH Fed.Sec.L.Rep. P94,065 (S.D.N.Y.1973); SEC v. Harwyn Industries Corp., 326 F.Supp. 943 (S.D.N.Y.1971). Although each of these cases involved the 1933 Act definition of 'sale,' a definition which explicitly requires that the 'disposition' be 'for value,'[10] each cited case rested on facts wholly inapposite to the instant one. In each instance, the court held that the parent corporation had received 'value' or consideration for the 'disposition' of its subsidiary through the creation of a public market in the subsidiary's shares, an 'aftermarket' which substantially increased the value of the spun-off subsidiary's shares retained by the parent corporation or by the insiders in control of the parent. In contrast, the thrust of ICC's complaint is that it was fraudulently induced to part with its subsidiary, bearing with it a very valuable asset in the form of a Boeing 707 aircraft, without receiving any value whatsoever.[11] In short, we do not believe that ICC can find comfort in the Harwyn line of cases for the proposition that its spin-off of Fairfield General constituted a 'sale' under 10(b) and Rule 10b-5.
 
 
 28
 Finding the analogy to Harwyn and its progeny inapt, we searched, but in vain, for a precedential response to the precise question whether a dividend of portfolio securities might satisfy the 'purchase of sale' requirement of 10(b) and Rule 10b-5. Our attention, of course, was directed to the seminal case construing 'purchase' and 'sale' in the context of 16(b) of the 1934 Act, Shaw v. Dreyfus, 172 F.2d 140 (2d Cir.), cert. denied, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949). In Shaw, a divided panel of this Court held that the receipt of stock rights, essentially analogous to a stock dividend because issued on a pro rata basis to all shareholders, did not constitute a 'purchase' of those rights by the stockholders. Although apprised of the broad definitional language of 'purchase'[12] and 'sale'[13] under the 1934 Act, we declined to interpret the term 'purchase' to include any 'acquisition' or the term 'sale' to include any 'disposition.' Instead, over the sharp dissent of Judge Clark, the majority stated that a 'purchase' or 'sale' meant an acquisition or disposition for consideration. Thus, Shaw held that since the shareholder recipients of the stock rights had not given the corporation any quid pro quo in return for these rights, their acquisition was not a 'purchase,' and there was no liability under 16(b) for any profit on their subsequent, short-swing sale.
 
 
 29
 The Fairfield Group strenuously argues that our decision in Shaw governs the instant case. They contend that the ICC dividend in kind of the Fairfield General securities is identical with the rights distribution in Shaw because both were distributed on a pro rata basis to all stockholders and neither required any payment by the recipient shareholders in return. Without in any way questioning the soundness of our decision in Shaw, we do not find it determinative, for we are mindful of the following words of caution uttered in a remarkable similar context by the Supreme Court:
 
 
 30
 Although the interdependence of the various sections of the securities laws is certainly a relevant factor in any interpretation of the language Congress has chosen, ordinary rules of statutory construction still apply. The meaning of particular phrases must be determined in context, SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 350-351 (64 S.Ct. 120, 123-124, 88 L.Ed. 88) (1943). Congress itself has cautioned that the same words may take on a different coloration in different sections of the securities laws; both the 1933 and the 1934 Acts preface their lists of general definitions with the phrase 'unless the context otherwise requires.' 1933 Act, 2, 48 Stat. 74, 15 U.S.C. 77b; 1934 Act, 3, 48 Stat. 882, 15 U.S.C. 78c. We must therefore address ourselves to the meaning of the words 'purchase or sale' in the context of 10(b). Whatever these or similar words may mean in the numerous other contexts in which they appear in the securities laws, only this one narrow question is presented here.
 
 
 31
 SEC v. National Securities, Inc., 393 U.S. 453, 466, 89 S.Ct. 564, 571, 21 L.Ed.2d 668 (1969).
 
 
 32
 We must, therefore, in accordance with the teaching of National Securities, consider whether the fraudulent conduct alleged, in this case the withholding of information pertinent to the issuance of a portfolio security dividend, 'is the type of fraudulent behavior which was meant to be forbidden by the statute and the rule.' Id. 393 U.S. at 467, 89 S.Ct. at 572. In seeking to effectuate the purpose of 10(b), we recognize that it 'must be read flexibly, not technically and restrictively.' Supt. of Insurance v. Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Moreover, the Court, in Bankers Life, emphasized that 10(b) was intended by Congress to protect investors, including corporations, from deceptive devices and contrivances which would inhibit informed decision-making in the course of securities transactions. And, the Court quoted with approval the following language from Shell v. Hensley, 430 F.2d 819, 827 (5th Cir. 1970):
 
 
 33
 When a person who is dealing with a corporation in a securities transaction denies the corporation's directors access to material information known to him, the corporation is disabled from availing itself of an informed judgment on the part of its board regarding the merits of the transaction. In this situation the private right of action recognized under Rule 10b-5 is available as a remedy for the corporate disability.
 
 
 34
 Supt. of Insurance v. Bankers Life & Cas. Co., supra, 404 U.S. at 13, 92 S.Ct. at 169.
 
 
 35
 In light of this umbrella of protection placed over securities transactions by 10(b), we are of the view that ICC must be deemed to be a 'seller' of its Fairfield General stock at the time it disposed of its Fairfield General portfolio securities by way of a dividend in kind to its shareholders. The decision whether to retain or spin-off a subsidiary is indeed an important one for the parent corporation. The possible asset drain must be weighed against such considerations as the desirability of removing the blight of an unprofitable subsidiary from the consolidated income statistics reported to the public. In any event, it is a transaction involving, as it unquestionably does, the disposition of securities and, therefore, one for which the corporation is well deserving of and entitled to the protection of 10(b).
 
 
 36
 Nor do we believe, as our dissenting brother suggests, that because ICC's shareholders were not required to part with consideration in return for the dividend of Fairfield General portfolio stock, the transaction was beyond the purview of 10(b). By thus focusing on the absence of harm to the recipient shareholders, the dissent simply ignores the fact that the statute was intended to safeguard not only the shareholders of a defrauded corporation, but its creditors as well. The Court noted in Bankers Life,id. at 12, 92 S.Ct. at 169:
 
 
 37
 . . . the fact that creditors of the defrauded corporate buyer or seller of securities may be the ultimate victims does not warrant disregard of the corporate entity. The controlling stockholder (Vesco in this instance) owes the corporation a fiduciary obligation-- one 'designed for the protection of the entire community of interests in the corporation-- creditors as well as stockholders.' Pepper v. Litton, 308 U.S. 295, 307 (60 S.Ct. 238, 245, 84 L.Ed. 281).
 
 
 38
 And, to be sure, the creditors of ICC may be significantly and adversely affected when the asset base of the corporation is eroded by a portfolio security dividend.[14]
 
 
 39
 We therefore reject our dissenting brother's paean to literalness in construing the term 'sale' to require the passage of consideration in order to inject the requisite significance into the disposition of securities. Learned Hand wisely counselled:
 
 
 40
 Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.
 
 
 41
 Cabell v. Markham, 148 F.2d 737, 739 (2d Cir. 1945). Accordingly, although in other contexts the term 'sale' might appropriately be construed more narrowly,[15] we find a rote emphasis on consideration inconsistent with the broad scope of protection under 10(b) for those who engage in transactions eventuating in the acquisition or disposition of securities.[16]
 
 B. The Venue Question
 
 42
 The Fairfield Group asserts a second jurisdictional defect in this action, contending that venue was improperly laid in the Southern District of New York. This argument merits short shrift. The applicable provision of the 1934 Act, 15 U.S.C. 78aa, states in pertinent part:
 
 
 43
 Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder . . . may be brought in any (district wherein any act or transaction constituting the violation occurred) . . ..
 
 
 44
 In this case, ICC claims that a 10(b) violation occurred when it was fraudulently induced to spin-off its Fairfield General subsidiary. An essential element of that fraudulent scheme was the actual mailing of the spin-off dividend to the ICC shareholders. It is uncontroverted that the mailing was performed by ICC's transfer agent, the Marine Midland Bank, from its offices in Manhattan. Accordingly, since 'any use of instrumentalities of the mails or other interstate facilities made within the forum district constituting an important step in . . . (the) consummation (of the fraudulent scheme) is sufficient', Hooper v. Mountain States Securities Corp., 282 F.2d 195, 204-205 (5th Cir. 1960), cert. denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961), venue in the Southern District of New York is proper.
 
 C. The Preliminary Injunction
 
 45
 With these jurisdictional hurdles behind us, we have little difficulty in affirming the preliminary injunction insofar as it restrains the Fairfield Group from disposing of the Boeing 707. Although an extraordinary remedy, a preliminary injunction is properly granted to preserve the status quo pendente lite where the balance of hardships tips decidedly toward the party requesting the trmporary relief and that party has raised questions going to the merits so serious, substantial, and difficult as to make them a fair ground for litigation and thus for more deliberate investigation. Sonesta International Hotels Corp. v. Welligton Associates, 483 F.2d 247, 250 (2d Cir. 1973); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953). ICC has easily satisfied both requirements.
 
 
 46
 Richardson and McAlpin, both former directors of ICC, have stated in their affidavits that information material to their decision to approve the spin-off of Fairfield General was withheld from them. Although raising an interesting application of the fraud provisions under 10(b), these uncontroverted statements certainly present 'a fair ground for litigation and thus for more deliberate investigation.' Id.
 
 
 47
 That the balance of hardships tips decidedly in favor of ICC cannot fairly be questioned. It appears from the record that the Boeing 707 is now[17] the sole substantial asset owned by Fairfield General or its subsidiaries. Its sale might well result in the dissipation of an important asset, leaving little for ICC to recapture if it should eventually succeed in this lawsuit. We have recognized that an asset freeze may be appropriate to assure compensation to those who are victims of a securities fraud. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1105-1106 (2d Cir. 1972). Moreover, Judge Stewart has narrowly fashioned the injunctive decree so that it will not interfere with the operation of the aircraft.[18] Accordingly, we do not find that the district court abused its discretion by enjoining the sale of the Boeing 707 pendente lite.
 
 
 48
 D. The New Jersey Suits by Skyways and the Fairfield Group
 
 
 49
 We turn finally to appellants' contention that the district court was without authority to enjoin the prosecution of the pending state court actions, one of which was instituted by Skyways to enforce the Boeing 707 lease, while the second was initiated by the Fairfield Group to recover certain books and records which ICC has refused to release to the Group. The limited authority of a federal court to stay a pending state court proceeding is embodied in 28 U.S.C. 2283 which states:
 
 
 50
 A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.
 
 
 51
 Moreover, in construing this statute, we are counselled to resolve
 
 
 52
 any doubts as to the propriety of a federal injunction against state court proceedings . . . in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy. The explicit wording of 2283 itself implies as much, and the fundamental principle of a dual system of courts leads inevitably to that conclusion.
 
 
 53
 Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 297, 90 S.Ct. 1739, 1748, 26 L.Ed.2d 234 (1970). In light of this presumption against interference, we must agree with the Fairfield Group that the district court erred by enjoining the prosecution of the two state court suits.
 
 
 54
 In support of its request for this relief, ICC urges that the district court possessed the requisite authority under 21(e) of the 1934 Act (15 U.S.C. 78u) which, argues ICC, satisfies the 'except as expressly authorized by Act of Congress' language of 2283.[19] Section 21(e) provides:
 
 
 55
 Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule or regulation thereunder, it may * * * bring an action * * * to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.
 
 
 56
 Although this language empowers the SEC alone to obtain injunctive relief, we have held that, under certain circumstances, it may be construed to authorize a private party to enjoin a pending state court action where the very prosecution of that lawsuit furthers a violation of the securities laws. Studebaker Corporation v. Gittlin, 360 F.2d 692 (2d Cir. 1966).
 
 
 57
 ICC contends that our holding in Gittlin is applicable to this case. Its argument, accepted by Judge Stewart, is basically that but for the spin-off of Fairfield General, a transaction fraudulently induced in violation of 10(b), neither Skyways nor the balance of the Fairfield Group would enjoy the independent status effectively required to sue its former parent. Thus, ICC concludes that, as in Gittlin, where Gittlin's state court action against Studebaker was permanently enjoined because Gittlin had obtained the necessary stockholder authorizations by violating the Proxy Rules issued under 14(a) of the 1934 Act, here too, the state court actions are predicated on violations of the securities laws.
 
 
 58
 There is, however, a critical distinction between Gittlin and the instant case. In Gittlin, the injunction issued after a decision on the merits holding that Gittlin had, in fact, violated 14(a), while in this case, ICC's claim of a 10(b) violation, though presenting a fair ground for subject matter jurisdiction and a temporary injunction has yet to result in a judgment on the merits after trial. To be sure, the SEC, under 21(e), is empowered to secure a preliminary injunction, but, in view of the explicit words of caution appearing in Atlantic Coast Railroad, we decline to extend the Gittlin rationale to the facts of this case.
 
 
 59
 This conclusion, moreover, is buttressed by our decision in Vernitron Corporation v. Benjamin, 440 F.2d 105 (2d Cir.), cert. denied, 402 U.S. 987, 91 S.Ct. 1664, 29 L.Ed.2d 154 (1971), decided subsequent to Gittlin. In Vernitron, a preliminary injunction was sought and granted to restrain a pending state court action which, the moving party claimed, was brought to enforce a contract obtained by fraudulent conduct violative of 10(b). We reversed, finding Gittlin 'inapposite in that the prosecution of the state action there relevant would itself have furthered the violation of the Securities Exchange Act.' Vernitron Corporation v. Benjamin, supra, 440 F.2d at 108. Since the facts here bear greater resemblance to Vernitron than Gittlin, we believe our decision in Vernitron to be the more applicable. Accordingly, we vacate so much of the preliminary injunction against the Fairfield Group that enjoins further prosecution of the two actions pending in New Jersey Superior Court, without prejudice to renewal of the application upon a showing that prosecution of these actions has interfered or threatens to interfere with the district court's jurisdiction or a judgment issued by it.
 
 III. THE VESCO & CO. APPEAL
 
 60
 The circumstances surrounding appellant Vesco & Co.'s alleged role in the purported scheme to defraud ICC are, in the context of this sprawling and labyrinthine lawsuit, remarkably straightforward. Indeed, our knowledge of the details relating to Vesco & Co. derives principally from an affidavit submitted by Milton Stern, counsel for Vesco & Co., in support of its unsuccessful motion to dismiss the complaint. Vesco & Co., it appears, was incorporated in Delaware on July 12, 1972 as an estate planning device for Robert Vesco. At that time, Vesco exchanged 800,000 shares of ICC common stock for all of the preferred stock of Vesco & Co. The common stock of Vesco & Co. is owned by Patricia Vesco, Vesco's wife, as custodian for Vesco's children. The sole asset of Vesco & Co. is the block of ICC common stock which, through the additional contributions of Vesco's children, totals 846,380 shares. Furthermore, we have been advised that the officers of Vesco & Co. are Mrs. Vesco and defendant Shirley Bailey, Vesco's personal secretary.
 
 
 61
 On facts such as these, which can hardly be characterized as common, routine or without the semblance of taint, ICC moved for and was granted a preliminary injunction enjoining Vesco & Co. from disposing of the 846,380 shares of ICC common stock pendente lite. Judge Stewart found[20] that Vesco & Co. was merely Vesco's alter ego and, as such, would be equally liable should ICC sustain its claim of a 10(b) violation against Vesco. The district court also granted ICC's motion for preliminary relief restraining Vesco & Co. from prosecuting a pending state court action, finding such injunctive relief necessary to protect and effectuate its judgment, entered with the consent of ICC, in SEC v. Vesco et al., supra.
 
 A. Vesco & Co.'s Preliminary Defenses
 
 62
 In attacking the preliminary injunction, Vesco & Co. contends-- as did the Fairfield Group-- that the district court lacked subject matter jurisdiction under the 1934 Act. It adds that this jurisdictional basis is essential here because in personam jurisdiction over Vesco & Co., a Delaware corporation doing no business in New York, can only be sustained under the nationwide service of process authorized by the 1934 Act, 15 U.S.C. 78aa-- an issue raised also in the Fairfield Group appeal. The district court denied this claim holding that, as a court of equity, it could pierce the corporate veil and treat Vesco & Co. as the equivalent of its dominant shareholder, Vesco. Thus, since ICC had unquestionably stated a claim under 10(b) against Vesco, the court had jurisdiction as well over Vesco & Co. We agree.[21]
 
 
 63
 Although we need not labor the principle that the law will ordinarily treat the corporation as an entity distinct from its shareholders, it is equally well-established that 'whenever it is necessary to relieve or to protect from frauds, the corporation may be disregarded as against the responsible parties.' 1 Fletcher Cyc. Corp., Perm.Ed. 44; Cf. In re Gibraltor Amusements, Ltd., 291 F.2d 22 (2d Cir.), cert. denied, 368 U.S. 925, 82 S.Ct. 360, 7 L.Ed.2d 190 (1961). In this case, we note that ICC's detailed allegations of fraud against Vesco, personally, have now ripened into a default judgment.[22] Moreover, the virtual identity of interest between Vesco and Vesco & Co. is uncontroverted, as is the fact that Vesco actually transferred his ICC common stock to Vesco & Co. at a time when he was actively engaged in his allegedly fraudulent scheme. Finally, we have sustained 1934 Act jurisdiction over a corporation that participated in the fraudulent scheme solely as transferee for the illicit fruits. SEC v. Manor Nursing Centers, Inc., supra (jurisdiction over defendant Capital Cities Nursing Centers, Inc.). Thus, although ICC does not claim that the ICC common stock itself represents the fruits of Vesco's fraudulent conduct, nevertheless, we believe that the district court had ample power, as a court of equity, to reach those assets under the jurisdictional purview of the 1934 Act.
 
 
 64
 Vesco & Co. also contends that the complaint was defective in failing to state a valid claim against it. Admittedly, the solitary reference to Vesco & Co. in P5(r) of the complaint-- 'a Delaware corporation to which defendant Vesco and his children have transferred certain of their assets'-- is not replete with detail. Yet, the 'notice pleading' mandated by Rule 8(a) of the Federal Rules of Civil Procedure requires that the complaint be construed liberally, Conley v. Gibson, 355 U.S. 41, 79 S.Ct. 99, 2 L.Ed.2d 80 (1957); Dioguardi v. Durning, 139 F.2d 774 (2d Cir. 1944); and 'jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which . . . (the pleader) could actually recover.' Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946). See A. T. Brod & Co. v. Perlow, 375 F.2d 393, 398 (2d Cir. 1967). Accordingly, in view of the more than adequate allegations of fraud against Vesco, the allegation that he transferred certain assets to Vesco & Co. was sufficient to suggest that ICC would urge a piercing of the corporate veil as the basis for judgment against Vesco & Co.[23] Moreover, in light of the allegations in the affidavits accompanying the applications for the preliminary injunctions, the interstices of the complaint have been filled in. We would be acting contrary to the spirit of the Federal Rules if we did not recognize the ease with which the complaint may be amended under these Rules to supply any additional allegations required to make the complaint more informative.
 
 B. The Preliminary Injunction
 
 65
 Turning to the propriety of the injunctive relief fashioned by the district court, we find, for the reasons substantially set forth in Part II, that the district judge was well within his discretion in enjoining the disposition of the 846,380 shares of ICC common stock. With Vesco now well beyond the reach of ICC and the United States, this large and perhaps controlling block of ICC common stock is indeed a critical asset should ICC prevail on the merits against Vesco & Co. Sale of the stock would only aggravate the alleged fraud. Indeed the Vesco family, as sole shareholders, are unlikely to evidence concern over improper disposal of this asset. Moreover, as a holding company, Vesco & Co. will hardly experience any disruption in operations-- an element to be considered by the district court in evaluating the appropriateness of an asset freeze. See SEC v. Manor Nursing Centers, Inc., supra, 458 F.2d at 1106. Accordingly, the balance of hardships once abain tilts in ICC's direction.
 
 
 66
 The other half of the preliminary injunction equation set forth by Hamilton Watch and its progeny-- the existence of serious questions establishing a fair ground for further litigation-- has also been satisfied by ICC in its claim abainst Vesco & Co. That Vesco, himself, is responsible to ICC because of his fraudulent scheming, has now been established by the default judgment. The only question which remains, therefore, is whether ICC may pierce the corporate shell and reach the assets contained within it. As we have already made clear, both the timing of incorporation and the precise identity between the stockholders and officers of Vesco & Co. and Vesco, his family, and personal secretary are more than sufficient to provide fertile ground for 'more deliberate investigation.'
 
 
 67
 C. The New Jersey Suit by Vesco & co.
 
 
 68
 That portion of the preliminary injunction restraining Vesco & Co. from prosecuting its pending state court action still remains for our consideration. The state suit, filed in the Chancery Division of the Superior Court of New Jersey, is based on a complaint containing four counts in a derivative action filed by Vesco & Co. on behalf of ICC. Counts one and two seek compensatory and punitive damages against Laurence Richardson, a former director, and Gary Benjamin, a former officer of ICC for alleged breach of their fiduciary obligations to the company. Count three charges that ICC 'has paid, or is contemplating payment of, the personal legal fees and expenses' for three former directors, Richardson, Frank Beatty, and Wilbert Snipes, incurred in their defense of actions against them for mismanagement. Vesco & Co. prays for an injunction against future payments, and the return of any such reimbursements to date. Finally, count four of the complaint alleges that the former board of directors of ICC 'abdicated their responsibilities as directors' by consenting to the 'Final Judgment of Permanent Infunction and Appointment of Special Counsel and Directors' which terminated ICC's involvement in SEC v. Vesco et al., supra. As relief, Vesco & Co. seeks, inter alia, to enjoin the court-appointed board of directors from exercising their duties.
 
 
 69
 In granting ICC's request to enjoin this lawsuit, Judge Stewart relied on the exception in 2283 which authorizes a federal court to stay a state court proceeding 'to protect or effectuate its judgments.' Although Atlantic Coast Railroad teaches that this exception must be narrowly construed, it clearly supports injunctive relief restraining count four of Vesco & Co.'s New Jersey action. This count represents a direct assault on the Final Judgment entered by Judge Stewart in SEC v. Vesco et al., supra, and constitutes an attempt to frustrate the courths order appointing a new board of directors for ICC by seeking to enjoin the functioning of the board. Accordingly, we have little difficulty in sustaining the preliminary injunction restraining Vesco & Co. from proceeding with count four of its complaint.
 
 
 70
 We reach a contrary conclusion, however, with respect to the remaining counts of this state suit. We do not find in these counts the kind of real or potential conflict with the Final Judgment in SEC v. Vesco et al., supra, which we believe is required to justify the disfavored intervention into the orderly proceedings of a state court. Although the Final Judgment vests Special Counsel with the power to prosecute claims on behalf of ICC, the court's order does not purport to override the traditional right of a stockholder to sue on the corporation's behalf. See 13 Fletcher Cyc. Corp., Perm.Ed. 5940. Even were we to accept ICC's contention that appointment of Special counsel and a new board of directors was equivalent to the appointment of a receiver, it is well-settled that a derivative suit could be instituted, provided a proper demand had been made and refused by the receiver. Lucking v. Delano, 129 F.2d 283, 286 (6th Cir. 1942); 13 Fletcher Cyc. Corp., Perm.Ed. 5966. Accordingly, we vacate so much of the preliminary injunction which restrains Vesco & Co. from prosecuting counts one-three of its pending state court action, without prejudice to renewal of the application upon a showing that prosecution of these counts has interfered or threatens to interfere with the district court's jurisdiction or a judgment issued by it.
 
 IV. THE ANDEAN APPEAL
 
 71
 The seeds of Andean's involvement in the instant lawsuit were planted on July 27, 1973. On that date, United States Customs officials seized the yacht, Patricia III, while it was undergoint repairs at the Merrill Stevens Dry Dock Company in Miami, Florida. The yacht was of Panamanian registry, the registration certificate having been issued to Andean, a Panamanian corporation. The vessel was seized for allegedly failing to pay duties pursuant to relevant Tariff Schedules of the United States. These payments are required as duty assessments on yachts of foreign origin which enter the United States while chartered to or owned by a resident of the United States. In this instance Vesco was that American resident.
 
 
 72
 One week after the yacht's seizure by the United States, on August 3, ICC moved for and Judge Ward granted a temporary restraining order enjoining Vesco from removing the yacht from its Miami berth.[24] On August 14, Andean appeared as intervenor before Judge Ward and subsequently, on August 16, submitted a written application supported by an affidavit of counsel to Judge Stewart seeking to dissolve the restraining order on the ground that it and not Vesco was the owner of the Patricia III. ICC's response was that Andean was nothing more than a nominee for Vesco, and that the source of the funds used to purchase the yacht was Vesco. In the alternative, ICC claimed that the Columbus Trust Company (Columbus Trust) which held a $1,500,000 mortgage on the yacht, was either a mere conduit for moneys provided by Vesco or was, itself, independently liable to ICC as a result of its participation in Vesco's alleged scheme to loot the assets of ICC.[25]
 
 
 73
 In an effort to support its serious charges, ICC deposed Roland Boddy, Captain of the Patricia III, and Joseph Sutton, President of Merrill Stevens. ICC also sought to take the deposition of Eusebio Morales, Andean's sole shareholder, but Morales refused to appear in Miami for the deposition despite Judge Stewart's order so requiring.[26] ICC also failed in its effort to depose Donald Aberle, President of Columbus Trust, who, like Morales, preferred to remain in the snug harbor of Nassau. Unlike Morales, Aberle had not been ordered by the Court to appear. Instead, and by way of response to ICC's charges that Andean and/or Columbus Trust were fronts for Vesco, Andean submitted affidavits by Morales, Aberle, several other officers of Columbus Trust, and by Virgil Coakley, an assistant to the Controller of Property Resources Limited (PRL), a corporation in which ICC formerly had an indirect interest, and the assets of which were allegedly misappropriated by Vesco with the aid of Columbus Trust.
 
 
 74
 On October 2, 1973, an evidentiary hearing was held before Judge Stewart at which David Warham, former Controller of PRL, and Charles Bliven, a yacht broker who arranged the sale of the Patricia III to Andean, testified on behalf of ICC. Three days later, on October 5, 1973, the district judge issued his preliminary injunction, enjoining Andean and Columbus Trust from moving the Patricia III, an order from which only Andean has appealed.[27]
 
 A. The Preliminary Injunction
 
 75
 At the outset, we note that the question before us is quite narrow. Since both Vesco, against whom a default judgment has already been entered, and Columbus Trust, a Bahamian corporation, are effectively immunized from execution because they both are beyond the reach of the court, enjoying the protection of the Bahamian government, it is indisputable that ICC would be irreparably harmed should we permit this yacht, valued in excess of one million dollars, to depart our shores and sail to other lands, perhaps to a rendezvous with her alleged owner Vesco. Accordingly, with the balance of hardships so obviously in ICC's favor, we need decide only whether Judge Stewart abused his discretion in determining that serious questions were raised concerning the source or sources of the funds used to purchase the yacht and Columbus Trust's alleged role in defrauding ICC. Sonesta International Hotels Corp. v. Wellington Associates, supra; Checker Motors Corp. v. Chrysler Corp., supra; Hamilton Watch Co. v. Benrus Watch Co., supra. After a careful review of the record, we find no abuse.
 
 
 76
 Morales's affidavit discloses that Andean was formed in February, 1973, when Morales contributed $10,000 in return for all of the corporation's stock. After its incorporation, neither Andean nor Morales played more than a passive role in the purchase or operation of the Patricia III. Instead, it was Aberle who negotiated for the acquisition of the yacht from Charles Bliven & Co., yacht brokers. On May 14, 1973, Columbus Trust wired $1,326,000 to Bliven, and Andean took title to the yacht.
 
 
 77
 Thereafter, Andean entered into a charter party with Mackinley Limited, a Bahamian corporation whose interest in chartering a luxury yacht had, according to Aberle, initially prompted his negotiations with Bliven. Mackinley, however, was hardly a stranger to Aberle, who, coincidentally, happened to be Mackinley's Secretary. Moreover, it does not appear wholly without significance or is it perhaps simply another coincidence, that a letter sent by Aberle to the Registrar-General of Nassau in February, 1973 stated that Vesco was appointed as Director and President of Mackinley. To add yet a third curious note, we find that Aberle subsequently termed this appointment 'incorrect' in a second letter to the Registrar-General, sent shortly after the first, in which Aberle made the rather unusual request that the first letter be returned. In any event, Mackinley's strange background aside, it arranged with Andean for a one-year charter, with an option to renew for five additional one-year periods, at the rate of $30,000 per month.
 
 
 78
 On June 20, 1973, Vesco, Patricia Vesco, his wife, and Vesco's family boarded the yacht (renamed Patricia III after its purchase) and Vesco and his family remained it sole users until shortly before it put into Miami for repairs. The record discloses that Vesco submitted plans for the extensive refurbishing and refitting of the yacht's interior. Indeed, in July, 1973 a check for $40,000 was issued by Patricia Melzer (Mrs. Vesco's maiden name), on behalf of Mackinley, Ltd., to Merrill Stevens Dry Dock Company in partial payment for work performed on the yacht. Payment on this check was stopped, however, and it was replaced with a check issued by Columbus Trust.
 
 
 79
 Turning our attention to Columbus Trust and its pedigree, we observe that it was incorporated by Aberle and one Dobbie in 1969 as a vehicle for those seeking to invest capital in the Bahamas, a tax haven not unknown to the initiated. By 1973, Dobbie's interest was acquired by the Bahamas Commonwealth Bank, Ltd. (BCB), a defendant in this lawsuit. BCB was in turn controlled by Norman LeBlanc, another defendant and both are also defendants in SEC v. Vesco et al., supra, against whom default judgments have been entered in the SEC action.
 
 
 80
 In March, 1973, Aberle and two other Bahamians purchased BCB's interest in Columbus Trust. In that same month, according to Warham's testimony at the evidentiary hearing before Judge Stewart, PRL, of which LeBlanc was a director, arranged to have Columbus Trust manage the not insignificant sum of $40,750,000 then held in certificates of deposit in PRL's account in London. Warham also testified that this important arrangement was consluded at the behest of Vesco, who, though neither a director nor officer of PRL, appeared to have a strong influence over the management of PRL's funds. Finally, Warham described in some detail a series of transactions by which PRL-- which was controlled by a corporation (Value Capital Limited) in which ICC owned a controlling interest-- was subsequently transferred by Vesco, through ICC's sale of its interest in Value Capital Limited, to a corporation dominated by LeBlanc. This series of transactions have been alleged by both the SEC and ICC to have violated the securities laws.
 
 
 81
 Once Columbus had control of PRL's $40,750,000 it proceeded to purchase $5,700,000 in Costa Rican bonds from BCB. Another $3,350,000 is, according to Coakley's affidavit and a telex exhibit from a Panama bank, deposited in the Banco Nacional de Panama. The balance of $31,700,000 remains in London, frozen in PRL's account by an order of the English Chancery Court.
 
 
 82
 Upon the foregoing, we can hardly say that ICC has failed to raise serious questions concerning the source of funds used to purchase the Patricia III. One thing appears clear: Andean performed no function other than that of a mere nominee or shell. Aberle undertook all negotiations for the yacht's acquisition, and it is undisputed that Columbus Trust supplied both the $1,326,000 purchase price and the substantial sums subsequently required to repair and refit the yacht. Moreover, at the evidentiary hearing, ICC submitted an audited financial statement of Columbus Trust revealing a net worth of only $266,808 as of March 31, 1972. Although this net worth figure related to a period more than one year prior to the yacht's purchase, we are unaware of any effort by Columbus Trust to rebut this evidence by introducing a more recent financial statement, although such information is under the control of Columbus Trust. We conclude on the totality of circumstances that ICC has made a sufficient showing of Vesco's interest in the yacht to sustain the injunctive relief granted.[28] Accordingly, we need not pass upon ICC's alternative contention, also accepted below, that it has demonstrated with sufficient likelihood Columbus Trust's liability to ICC through its mishandling of the PRL funds.
 
 B. The Posting of Security
 
 83
 Andean claims that the district court erred in denying its request for security by ICC, pursuant to Fed.R.Civ.P. 65(c). Rule 65(c) states, in pertinent part:
 
 
 84
 No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper . . ..
 
 
 85
 In construing this language, we have stated that, especially in view of the phrase-- 'as the court deems proper'-- the district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined. Ferguson v. Tabah, 288 F.2d 665, 675 (2d Cir. 1961). See also Urbain v. Knapp Brothers Manufacturing Co., 217 F.2d 810 (6th Cir. 1954), cert. denied, 349 U.S. 930, 75 S.Ct. 772, 99 L.Ed. 1260 (1955). Andean argues, however, that its inability to move the yacht has been costly, both in the loss of charter revenues and in additional maintenance expenses. ICC's response to this is quite simple. It claims that even were the restraint lifted, Andean would be unable to remove the yacht because of a forfeiture action brought by the United States in the Southern District of Florida for the unpaid assessed duties.
 
 
 86
 Subsequent to the argument of this case, we received a copy of findings of fact and conclusions of law signed by Judge Mehrtens in the actions pending before him in Florida. Although he found Andean liable for customs duties in the amount of $60,000, and indebted to the Merrill-Stevens Dry Dock Company in the sum of $77,474 for breach of a repairs and improvements contract, Judge Mehrtens denied the Government's claim for forfeiture. Thus, should Andean satisfy these judgments, it would be barred from removing the Patricia III only by the preliminary injunction granted below. Accordingly, in light of the Florida dispositions, we remand to the court below for reconsideration of Andean's motion for security.
 
 
 87
 Although we have scarcely plumbed the depths of Vesco's alleged financial manipulations, we have attempted to describe the intricacies of the web spun by him and his associates in their alleged scheme to ensnare the assets of ICC and its subsidiaries. Emerging from this maze of securities schemes, of corporate shells and subsidiary spin-offs, one point stands out in bold relief: the ingenious plotter cannot find a medium more supple than the world of securities to effectuate his design. Thus, we find in these appeals further proof of the wisdom in adopting a flexible approach to the application of Section 10(b), a judicial construction consonant with that Section's broad prophylactic purpose. Confidence in our securities markets can only be maintained by establishing a protective shield which cannot be circumvented by recourse simply to the novel, to the unexpected, or to entanglements difficult to unravel. We remand to the district court for further proceedings not inconsistent with this opinion.
 
 
 88
 MULLIGAN, Circuit Judge (concurring in part and dissenting in part):
 
 
 89
 This dissent is limited to the Fairfield Group Appeal covered in Part II of the majority opinion, and in particular to that section thereof which holds that the 'purchase or sale' requirement of the Act has been satisfied in this case.
 
 
 90
 The crucial question here is whether or not some deceptive device or scheme was employed by Vesco and his group 'in connection with the purchase or sale of any security' within the meaning of 10(b) and Rule 10b-5. The theory of plaintiff International Controls Corp. (ICC) is that Vesco, a corporate buccaneer, was intent upon securing for his personal use a Boeing 707, which was owned by Skyways Leasing Corp. and leased to ICC on terms which were distinctly disadvantageous to ICC. In addition it had been redesigned and refurbished at great expense to ICC to satisfy Vesco's sybaritic tastes rather than to accomplish the legitimate corporate purposes of ICC. Vesco, who was a major shareholder in ICC and at various times a holder of important corporate positions in the company, is alleged to have wasted corporate assets and generally to have deceived the ICC board of directors. Unquestionably, as the Fairfield Group admits, a complaint of corporate mismanagement in a stockholder derivative action would lie here. Although Mr. Justice Douglas did announce in Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), that 'Congress by 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement', it seems reasonably clear that the existence of internal corporate mismanagement does not insulate fraudulent practices which are induced by a controlling influence to the detriment and loss of a corporation, provided, of course, that the transaction is otherwise within the purview of 10(b) and Rule 10b-5. See Schoenbaum v. Firstbrook, 405 F.2d 215 (2d Cir. 1968) (en banc), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, i3 L.Ed.2d 219 (1969); Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964).
 
 
 91
 The first question is whether or not the fraud practiced was 'in connection with' the sale or purchase of securities. The pattern of misbehavior urged is novel and no precedent is adduced to support the proposition that it is connected to a security sale. However, I agree that the statute is to be construed liberally, and not restrictively, where its terms permit flexibility. Superintendent of Ins. v. Bankers Life & Cas. Co., supra, 404 U.S. at 12, 92 S.Ct. 165.
 
 
 92
 Vesco had originally secured the Boeing 707 through Skyways, the wholly-owned subsidiary of Fairfield Aviation Corp. Fairfield Aviation, in turn, was totally owned by ICC. The negotiation of the lease and the transformation of the commercial plane into a luxury air carrier were achieved by Vesco without any sale or purchase of securities. The theory of the complaint here is that, because Vesco, not otherwise a worrisome type, was concerned that the theretofore complacent and amenable board of ICC might prove troublesome, he engineered a series of devious moves to ensure his continuing use of a corporate asset for private pleasure. Fairfield General Corp. was therefore created, and all of the shares of Fairfield Aviation, were transferred to it. A dividend of Fairfield General shares to the stockholders of ICC was then declared by the board of ICC. As a result of these activities, Skyways and the plane came under the control of Vesco and three associates, who made up the board of directors of Fairfield General.
 
 
 93
 Obviously, the manipulation charged is indeed intricate, and separating the flim from the flam may well prove to be difficult. In any event, whether there exists between the fraud allegedly practiced upon ICC and the spin-off a nexus sufficient to satisfy the 'in connection with' requirement of the statute (see Note, The Controlling Influence Standard in Rule 10b-5 Corporate Mismanagement Cases, 86 Harv.L.Rev. 1007, 1010-15 (1973)) presents a question we need not now determine definitively. Since this is an appeal from a preliminary injunction which merely maintains the status quo, with the balance of hardships tipping sharply in ICC's favor and serious litigable issues presented, there is enough to sustain the injunction without determining the question with finality. See Exxon Corp. v. City of New York, 480 F.2d 460, 464 (2d Cir. 1973); Gulf & Western Indus., Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687 (2d Cir. 1973); A. H. Bull Steamship Co. v. National Marine Engineers' Beneficial Ass'n, 250 F.2d 332, 337 (2d Cir. 1957); American Federation of Musicians v. Stein, 213 F.2d 679 (6th Cir.), cert. denied, 348 U.S. 873, 75 S.Ct. 108, 99 L.Ed. 687 (1954); 601 West 26 Corp. v. Solitron Devices, Inc., 291 F.Supp. 882 (S.D.N.Y.1968), aff'd, 420 F.2d 293 (2d Cir. 1969); Garland v. Ruskin, 249 F.Supp. 977, 980 (S.D.N.Y.1965).
 
 
 94
 A key jurisdictional question remains. Was there a 'purchase or sale' of securities here under 10(b) and Rule 10b-5? The majority, while finding no 'purchase or sale' in the exchange of securities between Fairfield Aviation and Fairfield General, finds the spin-off, the stock dividend of Fairfield General shares to the stockholders of ICC, to be such a 'purchase or sale' within the 1934 Act and Rule. It is at this point that I respectfully but firmly part company with the majority.
 
 
 95
 Chief Judge Kaufman candidly admits that there is no precedent for the holding in this case, and, it should be added, the technique adopted by the majority was not even suggested by the appellee or by the SEC in its amicus brief. The majority simply equates purchase and sale with acquisition and disposition of securities, even though no consideration or value or price is involved in the transaction. This is not only unprecedented, but is contrary to the holding of the court in Shaw v. Dreyfus, 172 F.2d 140 (2d Cir.), cert. denied, 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719 (1949). The question before the court there was whether the receipt of stock rights concededly tantamount to a stock dividend was within the 'purchase or sale' definition of the 1934 Act, 3(a)(13) & (14), 15 U.S.C. 78c(a)(13) & (14), which is precisely the definitional section involved here. While 16(b), rather than 10(b), was the provision allegedly violated in Shaw, the court there, in applying the definition of 'purchase or sale,' stated: 'The popular or accepted import of words furnishes the general rule for the interpretation of statutes.' Id. at 142. The court found that 'purchase or sale' means that some price or consideration must be involved in the transaction in shares. Since the popular and accepted meaning of 'purchase or sale' still imports consideration, and since there is admittedly no precedent for any 10(b) construction which would eliminate consideration, I fail to see any basis for a differing interpretation. In fact, it is not so much an interpretation as it is an evisceration. Surely the use of 'purchase or sale' was an indication that Congress intended to place certain limitations upon the scope of 10(b). Congress did not declare that 10(b) was to apply to all 'transactions involving securities' or all 'dispositions of securities.' Instead, it chose terms which have had, and still retain, a conceptual significance now abandoned. In effect, the majority is construing 'purchase or sale' to include no purchase and no sale. If another definition of the coverage of the Act is to be provided, it must be provided by Congress and certainly not by a panel of this court.
 
 
 96
 Section 3(a)(13) & (14) of the Act defines 'purchase or sale' to include a contract to acquire or dispose of securities. There was here no contract to dispose of or to acquire securities, and there was no sale by ICC or purchase by ICC stockholders. The corporation received nothing in exchange for the dividend and the stockholders paid nothing. If a corporate spin-off of a 'portfolio subsidiary' is a purchase or sale simply because it involves a stock transaction or the disposition of securities by a corporation, then a normal corporate stock dividend, a gift of shares or a distribution of securities by a fiduciary can also be found to be a purchase or sale. The majority states that the scope of protection under 10(b) extends to 'those who engage in transactions eventuating in the acquisition or disposition of securities.' If there is to be any limitation upon the cases to which this broad definition may be applied in the future, the majority opinion gives no indication of what the guidelines may be, thus opening the door to future litigation which will require continuing appellate interpretation.
 
 
 97
 The majority emphasizes that the misbehavior here is the type meant to be proscribed by 10(b) and that the statute must be read flexibly.[1] Logically, this can only mean that the manipulative and deceptive devices or contrivances referred to in 10(b) and the further refinement of them in subsections (a), (b) and (c) of Rule 10b-5 should be construed broadly to encompass the myriad schemes of the malevolent and the greedy. See SEC v. Capital Gains Research Bureau, 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). While the Act and the Rule have this substantive fluidity, the fraud alleged must be in connection with a 'sale or purchase.' A flexible approach does not permit a court to extend the terms of a statute beyond their fair import.
 
 
 98
 The protection of the statute and the Rule is extended only to a 'seller or purchaser.' This has been the law of this circuit and other circuits[2] since it was announced by Judge Augustus N. Hand of this court in Birnbaum v. Newport Steel Corp., 193 F.2d 461, cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). This principle was recently reaffirmed in GAF Corp. v. Milstein, 453 F.2d 709, 721 (2d Cir. 1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972), wherein Judge Kaufman noted that this court has steadfastly refused to extend the reach of 10b-5 to give standing to an issuer. While the question of standing has not specifically been raised here,[3] I fear that the decision of the majority may portend the demise of the Birnbaum rule. We found in Birnbaum that Congress has determined that the umbrella of protection is to be extended only to purchasers and sellers in connection with a purchase or sale of securities. Although this rule has been criticized,[4] it serves the salutary purpose of foreclosing limitless liability under 10(b). See Bradford, Rule 10b-5: The Search for a Limiting Doctrine, 19 Buffalo L.Rev. 205 (1970).
 
 
 99
 Although Vesco is at best an unsympathetic figure, and his hegira, whether to the Bahamas, Costa Rica or even to Glubbdubdrib, hardly inspires confidence in his character, this is not adequate cause for a panel of this court to rewrite the statute and ignore precedent. 'We are not free to adopt a construction that not only strains, but flatly contradicts, the words of the statute.' Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 427, 92 S.Ct. 596, 601, 30 L.Ed.2d 575 (1972).
 
 
 100
 I respectfully dissent.
 
 
 
 [1]
 Three indictments are currently outstanding in the Southern District of New York in which Robert L. Vesco is named as a defendant. United States v. Vesco, 73 Crim. 707 (indictment filed Jury 20, 1973, charging wire fraud); United States v. Vesco, 73 Crim. 518 (indictment filed June 1, 1973, charging wire fraud); United States v. Mitchell, et al., 73 Crim. 439 (indictment filed May 10, 1973, charging Vesco with conspiracy and related substantive counts of obstructing justice, and conspiracy to defraud the United States in relation to the lawful functions of the SEC and the GAO)
 
 
 [2]
 New York Times, December 8, 1973, at 1, Col. 1. This report may be outdated, however, for it is rumored that Vesco has recently departed the Bahames for Costa Rica. 7 New York Magazine, December 31, 1973/January 7, 1974, at 5
 
 
 [3]
 Robert L. Vesco, Norman LeBlanc, Milton F. Meissner, Ulrich J. Strickler, Stanley Graze, Frank G. Beatty, Richard E. Clay, Wilbert J. Snipes, James Roosevelt, Frederick J. Weymar, Gilbert R. J. Straub, C. Henry Buhl, III, Allan C. Butler, Laurence B. Richardson, John D. Schuyler, Edward Stoltenberg, Howard F. Cerny, Georges Phillipe, Allan F. Conwill, Raymond W. Merritt, John S. D'Alimonte, IOS Ltd., International Controls Corp., Bahamas Commonwealth Bank, Ltd., Overseas Development Bank Luxembourg S.A., International Bancorp Ltd., Value Capital Ltd., Butlers Bank Ltd., Transglobal Financial Services Ltd., Kilmorey Investments Ltd., Global Holdings Ltd., Global Financial Ltd., I.I.T. Management Co., S.A., F.O.F. Management Co., Ltd., Venture Managment Co., Ltd., Transglobal Growth Fund Management Co., Ltd., Bank Cantrade, Ltd., Venture Fund (International), N.V., Fund of Funds, Ltd., Transglobal Growth Fund, Ltd., IIT, an International Investment Trust, and Consulentia Verwaltungs, A.G
 
 
 [4]
 The SEC has secured preliminary injunctive relief, following a lengthy evidentiary hearing, against Vesco and 12 individual and corporate defendants, Meissner, Strickler, Graze, Weymar, Straub, LOS Ltd., Transglobal Financial Services, Ltd., Kilmorey Investments Ltd., I.I.T. Management Co., S.A., F.O.F. Management Co., Ltd., Venture Management Co., Ltd., and Transglobal Growth Fund Management Co., Ltd. The SEC has also secured default judgments against LeBlanc, Bahamas Commonwealth Bank, Ltd., Overseas Development Bank Luxembourg, S.A., International Bancorp, Ltd., Value Capital, Ltd., Global Holdings, Ltd., and Global Financial, Ltd. Judge Stewart denied the SEC's request for a preliminary injunction against Beatty, Clay, Snipes, Schuyler and Stoltenberg. No preliminary relief, aside from the appointment of a temporary receiver for certain corporate defendants, was sought against the remaining defendants
 
 
 [5]
 Robert L. Vesco, Harry L. Sears, Frank G. Beatty, Norman LeBlanc, Stanley Graze, Milton F. Meissner, Ulrich J. Strickler, Richard E. Clay, Wilbert J. Snipes, Frederick J. Weymar, Gilbert R. J. Straub, C. Henry Buhl III, Ralph P. Dodd, Alwyn Eisenhauer, Georges Phillipe, Joel Grady, Shirley Bailey, Vesco & Co., Inc., IOS Ltd., Bahamas Commonwealth Bank, International Bancorp Ltd., Kilmorey Investments Ltd., Value Capital Ltd., Global Holdings Ltd., Global Financial Ltd., Butlers Bank, Ltd. (now known as Who Holding Ltd.), Allan J. Butler, Bank Cantrade Ltd., Fairfield Aviation Corporation, Fairfield General Corporation, Skyways Leasing Corporation and Marine Midland Bank
 
 
 [6]
 Ordinarily, we would give considerable weight to the detailed findings of fact of a district judge supporting his order granting the preliminary injunction. But, we must note our disapproval of the procedure utilized by Judge Stewart, roundly condemned in this as well as other circuits, of adopting in toto the findings of fact submitted by counsel for ICC. See e.g. Rooted Hair, Inc. v. Ideal Toy Corp., 329 F.2d 761 (2d Cir.), cert. denied, 379 U.S. 831, 85 S.Ct. 63, 13 L.Ed.id 40 (1964) (Medina, J. concurring). Since, however, no evidentiary hearing was required in this instance, we are in as good a position as the district judge to evaluate the facts, Dopp v. Franklin National Bank, 461 F.2d 873, 879 (2d Cir. 1972) and need not, therefore depend too heavily on his findings
 
 
 [7]
 At the time of the spin-off, the directors of Fairfield General were Vesco and defendants Beatty, Dodd, and Clay
 
 
 [8]
 In Blau, a similar conclusion was reached in the context of 16(b) of the 1934 Act. Nevertheless, we should not that having elevated the functional interpretation of the terms 'purchase' and 'sale' to the sine qua non of 16(b) analysis, see e.g. Abrams v. Occidental Petroleum Corp., 405 F.2d 157, 162 (2d Cir. 1971), aff'd sub nom., Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), we surely would by remiss were we to discard this functional approach in the milieu of 10(b). Accordingly, as we discuss further infra, we do not consider the interpretation of the terms 'purchase' and 'sale' as used in 16(b) to be dispositive of their meaning in the context of 10(b)
 
 
 [9]
 Shinn's affidavit states that the prospectus filed by Fairfield General contained numerous misstatements of fact. Although the existence of such misstatements, if proven, may demonstrate the fraudulent purpose of the Fairfield Group and its defendant directors, we cannot see the relevance of these alleged misrepresentations to ICC's claim under 10(b). To be sure, one who relied on this prospectus in the purchase or sale of Fairfield General stock might well assert a 10(b) claim against the issuer, Fairfield General or, perhaps, ICC as an 'underwriter.' But, ICC does not contend that any of its directors were misled by this prospectus in determining whether to approve the spinoff dividend, the transaction asserted to be the requisite 10(b) 'sale.' Accordingly, we do not believe it necessary to describe and analyze these alleged misrepresentations
 
 
 [10]
 Section 2(3) of the 1933 Act, 15 U.S.C. 77b(3), defines a 'sale' as 'every contract of sale or disposition of a security or interest in a security, for value.'
 
 
 [11]
 The SEC, as amicus, has proffered the argument that ICC received consideration for its Fairfield General spin-off in the form of the five-year lease of the plane with Skyways. Although it is true that both the lease and the spin-off were formally ratified by the board of directors on December 8, 1971, it is also the case that ICC had entered into the lease agreement and had begun paying rent on October 1, 1971. Accordingly, it is highly unlikely that ICC was induced to spin-off Fairfield General by the lure of a lease to which Skyways was firmly and, we might add, happily committed
 
 
 [12]
 Section 3(a)(13) of the 1934 Act, 15 U.S.C. 78c(a)(13), defines 'purchase' as follows:
 The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire.
 
 
 [13]
 Section 3(a)(14) of the 1934 Act, 15 U.S.C. 78c(a)(14), defines 'sale' as follows:
 The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of.
 
 
 [14]
 In this regard, a portfolio security dividend may have a substantially different impact on creditors than an ordinary stock dividend. Since the latter does not involve a distribution of corporate assets, corporate creditors are unlikely to be affected by a decision to issue a stock dividend. Cf. Hafner v. Forest Laboratories, Inc., 345 F.2d 167, 168 (2d Cir. 1965)
 
 
 [15]
 For example, since the primary purpose of 16(b) is to secure equality among shareholders inter se by depriving insiders of the fruits of their preferred position, Kern County Land Co. v. Occidental Petroleum Corp., supra, it may well be true, as we noted in Shaw v. Dreyfus, supra, that the statute's purpose would not be defeated by refusing to construe a pro rata distribution of securities as a 'sale' by the corporation or a 'purchase' by the recipient shareholders. This restrictive interpretation should not apply to 10(b), however, where the statute's protection was designed to cover the corporation's creditors as well as its shareholders. Supt. of Insurance v. Bankers Life & Cas. Co., supra
 
 
 [16]
 Our dissenting brother's 'fear' that our decision today signals the demise of the Birnbaum doctrine-- limiting standing to sue under 10(b) to the 'purchaser or seller' of securities-- is wholly unfounded. Having determined that ICC's dividend of its Fairfield General portfolio stock was the kind of meaningful disposition of securities which Congress sought to protect under 10(b), it could not be more clear that ICC was the 'seller' of those securities. Compare Birnbaum v. Newport Steel Corp., supra (the corporation lacked standing where its controlling shareholder sold his shares) with Ruckle v. Roto American Corp., supra (the corporation had standing where it had agreed to sell its own newly-issued shares)
 
 
 [17]
 According to Grady's affidavit, submitted on behalf of the Fairfield Group, Fairfield aviation had, at one time, operated the Caldwell Airport in New Jersey and had owned 'nearly a dozen aircraft.'
 
 
 [18]
 Judge Stewart originally enjoined the Fairfield Group from disposing of 'any and all other assets' of the companies, in addition to restraining the disposition of the Boeing 707. Upon application by the Fairfield Group, however, Judge Stewart modified his order to permit Skyways to meet its debt service obligations and other operating costs
 
 
 [19]
 ICC also contends that the direct court was authorized to enjoin the two New Jersey proceedings 'in aid of its jurisdiction' since federal courts have exclusive jurisdiction over matters arising under the 1934 Act, as provided in Section 27. This claim was made without success in Vernitron Corporation v. Benjamin, 440 F.2d 105 (2d Cir.), cert. denied. 402 U.S. 987, 91 S.Ct. 1664, 29 L.Ed.2d 154 (1971). We said in vernitron:
 To justify an injunction of a state court action, 'it is not sufficient to show that the matter properly before a state court embraces issues within the compass of the federal suit, even if the federal court has exclusive jurisdiction over its case.' Greater Continental Corporation v. Schechter, 304 F.Supp. 325, 330 (S.D.N.Y.1969), appeal dismissed 422 F.2d 1100 (2 Cir. 1970); accord, Lyons v. Westinghouse, 201 F.2d 510 (2 Cir. 1953) . . ..
 The policy of the anti-injunction statute, 28 U.S.C. 2283, is to prohibit enjoining of state court suits except in those situations where the real or potential conflict threatens the very authority of the federal court. The only conceivable interference here would be an attempt by the state court to determine issues of federal law, a tesk which it certainly has not as yet undertaken and which in any event would be wholly without effect.
 Id. at 108.
 
 
 [20]
 we must again comment on the unsatisfactory method used by the district court in 'formulating' its findings of fact and conclusions of law pursuant to Fed.R.Civ.P.52(a). See n. 5, supra. Vesco & Co. asserts that not only did Judge Stewart adopt in haec verba the proposed findings submitted by ICC, but that he followed this procedure without prior notice to Vesco & Co. Judge Stewart, upon learning of the absence of notice, however, offered Vesco & Co. the opportunity to submit additional evidence by affidavit or by way of an evidentiary hearing. Vesco & Co. declined this offer. Furthermore, since the district court's findings were based solely on documentary evidence, we shall not place heavy reliance upon them in evaluating the propriety of the injunctive relief granted. See n. 5, supra. Accordingly, we do not believe that Vesco & Co. was prejudiced by the district court's procedures or that reversal would serve the interests of due process
 
 
 [21]
 On this appeal, ICC has argued that there was jurisdiction under the 1934 Act on the alternative ground of ancillary jurisdiction premised on the final judgment entered with the consent of ICC in SEC v. Vesco et al., supra. The argument runs that the appointment of a Special Counsel and a board of directors was the equivalent of appointing a receiver, and that in Esbitt v. Dutch-American Mercantile Corp., 335 F.2d 141 (2d Cir. 1964), we recognized that 'if the receiver's suit is to aid in the accomplishment of the ends sought and directed in the SEC action, it is ancillary to the main action for jurisdictional purposes.' Id. at 142. Although we consider this point interesting, we find it unnecessary to decide whether the analogy is apt
 
 
 [22]
 The district court granted the default judgment against Vesco on October 5, 1973
 
 
 [23]
 Vesco & Co.'s reliance on the pleading requirements of Rule 9(b) of the Fed.R.Civ.P. is, therefore, misplaced. Rule 9(b)'s requirement that 'averments of fraud . . . be stated with particularity' is inapplicable here since ICC did not proceed on the theory that Vesco & Co., itself, committed fraud, but rather that Vesco perpetrated the securities violations and then sought to shield his assets from the reach of his victim by transferring them to Vesco & Co
 
 
 [24]
 On the same day, August 3, Andean filed a petition in the United States District Court for the Southern District of Florida seeking release of the yacht from the Government's seizure. On August 14, ICC intervened in the Florida action to oppose release. Thereafter, Judge Mehrtens entered an order providing in part:
 No person shall move or attempt to move the vessel 'Patricia III' from its present location on the Miami River, pending ruling by this Court or by the United States District Court for the Southern District of New York on the petition for permanent injunctive relief on behalf of intervenor-petitioner ('ICC').
 
 
 [25]
 Although Columbus Trust was not named as a defendant in the original complaint, ICC filed an amended complaint on September 7, 1973, curing this omission
 
 
 [26]
 Judge Stewart had originally granted Morales's request to be deposed in Nassau, but, upon reargument by ICC, ordered Morales to appear in Miami
 
 
 [27]
 At the time the preliminary injunction was ordered, Columbus Trust had not been served with process. The in personam jurisdiction requisite to the injunction's issuance against it, 7 J. Moore, Federal Practice P65.03(3) at 65-31 (2d ed. 1973), was found by Judge Stewart in Columbus Trust's voluntary appearance before the court through its representative at the Boddy deposition and the submission of affidavits by its officers on behalf of Andean. Whether this degree of participation is sufficient for jurisdictional purposes as to Columbus Trust is a question not before us, since Columbus Trust has not appealed from Judge Stewart's order. The district court clearly had the necessary jurisdiction over Andean by its intervention in the action, and Andean does not claim otherwise
 
 
 [28]
 Andean's reliance on Aschkar v. Curtis, 327 F.2d 306 (9th Cir. 1964), in which the Ninth Circuit refused to interpret the nationwide service of process authorized under the 1934 Act, 15 U.S.C. 78aa, as authority for attachment of defendant's property outside the forum district, is misplaced. Although the effedt of the preliminary injunction here is similar to an attachment, the method of obtaining this restraint is clothed with far greater protections for the defendant than under an attachment procedure
 
 
 [1]
 It should be noted that in Bankers Life, supra, relied upon by the majority as support for a flexible approach to the Act, there clearly was a sale of securities, since Manhattan Casualty Co., the complaining seller there, sold almost $5,000,000 in bonds. 404 U.S. at 9, 92 S.Ct. 165
 
 
 [2]
 See, e.g., Mount Clemens Indus., Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972); Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970); Simmons v. Wolfson, 428 F.2d 455 (6th Cir. 1970), cert. denied, 400 U.S. 999, 91 S.Ct. 459, 27 L.Ed.2d 450 (1971); Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir.), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed. 290 (1970); City Nat'l Bank v. Vanderboom, 422 F.2d 221 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970); Jensen v. Voyles, 393 F.2d 131 (10th Cir. 1968); Dasho v. Susquehanna Corp., 380 F.2d 262 (7th Cir.), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967)
 
 
 [3]
 In this area of the law, the distinction is not always made between the definition of 'purchase or sale' for the purpose of determining the coverage of the statute, and the definition of 'purchaser or seller' for the purpose of ascertaining who has standing to sue. See SEC v. National Securities, Inc., 393 U.S. 453, 467 n. 9, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); Note, SEC, Rule 10b-5-- 'In Connection With the Purchase or Sale of Any Security' Restriction: Need for Analytical Precision, 5 Colum. J. of L. & Soc.Prob. 28 (Aug. 1969). Although the decision here relates to the coverage of 10(b), it may also have implications for the standing doctrine as well.4 See, e.g., Boone & McGowan, Standing to Sue Under SEC Rule 10b-5, 49 Texas L.Rev. 617 (1971); Comment, The Purchaser-Seller Rule: An Archaic Tool for Determining Standing Under Rule 10b-5, 56 Geo. L.J. 1177 (1968); Comment, The Purchaser-Seller Requirement of Rule 10b-5 Reevaluated, 44 U.Colo.L.Rev. 151 (1972); Comment, The Decline of the Purchaser-Seller Requirement of Rule 10b-5, 14 Vill.L.Rev. 499 (1969)