In re PENN CENTRAL SECURITIES LITIGATION.

M.D.L. Docket No. 56

Civ. A. Nos. 70-2005, 70-2010, 70-2137, 70-2320, 70-2505, 70-2596, 70-2696, 70-2818, 70-2933, 71-265, 71-266, 71-267, 71-268, 71-277, 71-278, 71-280, 71-476, and 71-971.

United States District Court, E. D. Pennsylvania.

April 17, 1973.

David Berger, Gerald J. Rodos, Leonard Barrack, David Berger, P. A., Phila-

delphia, Pa., Alfred S. Julien, Julien, Glaser, Blitz & Schlesinger, New York City, Stanley Nemser, Nemser & Nemser, New York City, for plaintiffs.

Lewis H. Van Dusen, Jr., Raymond K. Denworth, Jr., Drinker, Biddle & Reath, Joseph W. Swain, Jr., John S. Estey, Montgomery, McCracken, Walker & Rhoads, Henry T. Reath, Duane, Morris & Heckscher, Thomas Raeburn White, Jr., White & Williams, Philadelphia, Pa., for defendants.

Mahlon F. Perkins, Jr., Donovan, Leisure, Newton & Irvine, New York City, for defendants Rabe, Routh and Taylor.

Edwin P. Rome, Morris L. Weisberg, Norman L. Holmes, Philip C. Patterson, Blank, Rome, Klaus & Comisky, Robert W. Blanchette, Philadelphia, Pa., for trustees of the Property of Penn Central Trans. Co.

## OPINION AND ORDER

JOSEPH S. LORD, III, Chief Judge.

On August 7, 1972, we handed down an Opinion and Order granting in part defendants' motions for partial summary judgment. In Re Penn Central Securities Litigation, 347 F.Supp. 1327 (E.D. Pa.1972).[1] Plaintiffs then filed a motion for reconsideration and reargument. Because of the complexity of the issues in this litigation, as well as our desire to hear fuller oral argument than we had previously heard, we granted plaintiffs' motion. The parties in due course submitted new briefs and presented oral argument.

Plaintiffs ask us to reconsider two of our conclusions: (1) that the 1969 merger and reorganization did not involve a purchase or sale for the purposes of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.

C.A. § 78j(b), and Rule 10b–5 adopted thereunder; and (2) that § 13(a) of the Exchange Act, 15 U.S.C.A. § 78m(a), affords no private right of action. Defendants ask that we modify our August 7 Order to grant summary judgment against those plaintiffs who were only *sellers* of Penn Central stock during the relevant period and who have sued pursuant to §§ 10(b) and 9(a) of the Exchange Act and §§ 11(a) and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.A. §§ 77k(a) and 77q(a).

## I. The 1969 Reorganization[2]

Nothing in plaintiffs' new briefs, affidavits or oral argument has convinced us that we should change our determination that the 1969 merger and reorganization did not involve a § 10(b) purchase or sale, nor has a careful review of the previous pleadings and the case law persuaded us to do so. Although the question is undeniably a close one, we think our previous conclusion was sound.

Plaintiffs have now presented us with a number of internal Penn Central documents dating from the months before the Plan of Merger and Reorganization was submitted to the shareholders for their approval. Most of the documents are memoranda from Penn Central's legal department to company officers, dealing with a range of subjects related to the planned reorganization. From the existence and the content of these exhibits we are asked to conclude (i) that the 1969 merger had a substantial economic and legal impact on the rights and interests of the shareholders; and (ii) that not all of the changes effected by the merger could have been brought about simply by amending the articles of

1. We find it unnecessary to repeat our extensive discussion of the facts and the law involved in this litigation. We therefore assume a close familiarity with our August 7 Opinion and Order, as well as our previous exposition of the factual background in our Opinion of December 16, 1971, In Re Penn Central Securities Litigation, 335 F.Supp. 1026 (E.D. Pa.1971).

2. Plaintiffs refer to the transactions which took place as a result of shareholder approval of the 1969 Plan of Merger and Reorganization as a "merger"; defendants use "reorganization". We use the terms interchangeably.

incorporation. Plaintiffs also argue, as they did when this motion was first before us, that the fact that many of the same results could have been achieved by amendment is of no consequence, since defendants chose the merger route rather than alternative means and a court must look to what they actually did, not what might have been. The ultimate conclusion we are asked to draw from all of this is that the holders of Penn Central stock at the time of the 1969 upwards merger were required to make a significant investment decision and hence were 10b–5 purchasers and sellers.

We are hardly surprised to learn from plaintiffs' exhibits that there was a great deal of planning and debate during the months preceding the submission of the reorganization plan to the shareholders. One would assume that before consummating this reorganization management would have given considerable thought to such matters as the tax consequences of the merger, the possible liability of officers and directors, and the capital structure of the proposed Holding Company. However, while the flurry of memoranda may well indicate that management thought the merger a corporate change with great economic consequences, the opinions of Railroad's officers and legal department are not binding on this court, and therefore need not concern us.

Plaintiffs appear to believe that our decision that the 1969 merger did not involve a 10b–5 purchase or sale was based on a conclusion that the 1969 merger was without economic consequences. If so, they have misinterpreted what we said. We were not unaware last August, nor are we unaware now, that the 1969 merger had certain economic consequences for the Penn Central corporate entity, as any important internal corporate reorganization ordinarily

will have. However, to say that the reorganization had economic consequences is not necessarily to say that it also involved a purchase or sale for the purposes of § 10(b) and Rule 10b–5. Nothing we have been shown has cast doubt on our conclusion that the economic consequences of the upwards merger were not those of a 10b–5 purchase or sale, but rather were those attendant upon the restructuring of an existing corporation. As we stated in our previous Opinion:

> "There were no additions to the corporation by way of merger or acquisition, and the stockholders' interests in the corporation were materially unchanged by the reorganization. In terms of the total assets represented by each share of stock, the stockholders of Penn Central Co. were in exactly the same position after the reorganization as they were before it occurred." 347 F.Supp. at 1338.

The flurry of internal memoranda, and plaintiffs' claims of great economic and legal consequences, do not alter these basic facts.

Plaintiffs point to two corporate changes resulting from the 1969 reorganization which, they argue, suggest that we were mistaken in our determination that the same results could have been achieved by amending the articles of incorporation.

The first has to do with the appraisal rights of dissenting shareholders. Railroad[3] had long been governed by statutes which gave dissenting shareholders appraisal rights in certain situations. Shortly before the merger, the directors elected to be governed by the Pennsylvania Business Corporation Law, an election which under the provisions of 15 P.S. § 1004, subd. C became effective immediately and did not require

---

3. As in our previous Opinion, we refer to the surviving corporation of the New York Central-Pennsylvania Railroad merger, which after the 1969 reorganization became known as the Penn Central Transportation Co., as "Railroad". We refer to the holding company which was formed as a result of the 1969 merger of which Railroad became a wholly-owned subsidiary as "Holding Co." Holding Co. ultimately became known as Penn Central Co.

shareholder approval. The B.C.L. provides that dissenting shareholders have no appraisal rights if their stock is listed on the New York or American Stock Exchange. 15 P.S. § 1515, subd. L (pocket part). Railroad's stock was listed on the New York Stock Exchange. Therefore, once the directors elected B.C.L. coverage, shareholders who objected to the plan of merger and reorganization had no right of appraisal.

Plaintiffs contend that defendants' conduct, beginning with their election of B.C.L. coverage and ending with the approval of the merger, fraudulently robbed the shareholders of appraisal rights which they had previously possessed under the old statutes governing the Railroad. They argue in effect that this deprivation of appraisal rights not only could not have been achieved merely by amending the articles of incorporation, but so materially changed the shareholders' interests that the entire transaction must be viewed as a 10b–5 purchase or sale.

Plaintiffs rely heavily on S. E. C. v. National Securities, 393 U.S. 453, 89 S. Ct. 564, 21 L.Ed.2d 668 (1969), which they claim is controlling here. We disagree. In National Securities, the SEC alleged that defendants had made material misstatements and omitted to state material facts in proxy materials sent to the shareholders of a stock insurance company (Producers) seeking their approval of a merger of Producers with defendants' insurance company. The Supreme Court concluded that "[t]he broad antifraud purposes of the statute and the rule would clearly be furthered by their application to this type of situation," and held that the purchase-or-sale requirement of § 10(b) and Rule 10b–5 was satisfied by a stockholder's exchange of shares pursuant to a merger. The Court reached this conclusion because the defendants' deception

> "furthered a scheme which resulted in [Producers shareholders'] losing their status as shareholders in Producers and becoming shareholders in a new

company. *Moreover, by voting in favor of the merger, each approving shareholder individually lost any right under Arizona law to obtain an appraisal of his stock and payment for it in cash.* Ariz.Rev.Stat. § 10–347 (1956). Whatever the terms 'purchase' and 'sale' may mean in other contexts, here an alleged deception has affected individual shareholders' decisions in a way not at all unlike that involved in a typical cash sale or share exchange." [Emphasis supplied.] 393 U.S. at 467, 89 S.Ct. at 572.

The 1969 plan of merger and reorganization, and its effect on the interests of the shareholders, is readily distinguishable from the scheme in National Securities. The Arizona statute cited by the Court in National Securities deals with the payment for and valuation of shares of dissenting shareholders of corporations which consolidate pursuant to a merger agreement. It provides in relevant part:

> "Any shareholder of the corporations consolidating *who votes to reject the agreement,* and who does not consent to the agreed manner of converting the shares of stock, shall be paid in cash the fair market value of the stock. * * * " Ariz.Rev.Stat. § 10–347 (1956). [Emphasis supplied.]

Therefore, the mere act of voting in favor of a merger agreement would *ipso facto* deprive the dissenting Arizona shareholder of the exercise of his appraisal rights after shareholder approval of the merger, since the statute by its terms grants appraisal rights only to shareholders who voted to reject a merger agreement. To put it another way, the loss of appraisal rights under Arizona law is a direct result of voting in favor of a merger.

We need not decide here whether the Pennsylvania statutes governing Railroad before the directors elected B.C.L. coverage did, as plaintiffs claim, provide dissenting shareholders with appraisal rights in connection with the kind of transaction involved in the 1969

reorganization.[4] For even if the stockholders did lose appraisal rights, they did so not as a result of being induced to vote in favor of the merger (as was the case in National Securities), but rather as a result of the decision of the Board of Directors to elect to come under the Pennsylvania B.C.L. This decision was entirely within the directors' discretion: they could elect B.C.L. coverage at any time without shareholder approval, whether there was a merger or not. We reject plaintiffs' suggestion that the election of B.C.L. coverage and the submission of the reorganization plan to the shareholders must be viewed as two stages of a unitary course of conduct. Even if the election of B.C.L. coverage was a prerequisite to bringing about the upwards merger, the election, with its consequent effect on dissenters' rights, was a properly unilateral act of the Board of Directors. Therefore, unlike the situation in National Securities, any loss of dissenters' rights was a result of the independent action of the directors and not of shareholder approval of the merger. The considerations which motivated the Court in National Securities to extend the protection of § 10(b) to fraud in connection with that merger approval do not apply here.[5]

The second corporate change which plaintiffs argue could not have been accomplished by amending the articles of incorporation, and which they claim resulted in significant changes in the entity in which the shareholders held stock,

has to do with the jurisdiction of the Interstate Commerce Commission (ICC) over the company's issuance of securities. Before the reorganization, Railroad, as a carrier, could not issue new securities without ICC approval. 49 U. S.C.A. § 20a. According to the 1969 Proxy Statement, management desired to carry out a diversification program through the issuance of additional securities. It felt that the securities of the new Holding Company would provide them with greater flexibility, since the Holding Company would not be subject to precisely the same ICC restrictions in the issuance of its securities for non-railroad purposes which governed the Railroad as a carrier.

■ However, the extent of the change in ICC jurisdiction was in doubt at the time the shareholders voted on the reorganization plan. As a non-carrier acquiring a carrier, Holding Company would, after the acquisition, "to the extent provided by the Commission * * * be considered as a carrier subject to" certain provisions, including the requirement that it obtain ICC permission to issue new securities. 49 U.S.C. A. § 5, para. (3). Therefore, approval of the merger did not actually effect the changes in ICC jurisdiction. Instead, it merely opened the possibility that the ICC would determine Holding Company either not to be a carrier or to be a carrier only with regard to a limited range of activities.

4. It would also be unwise to reach this question at this time, since it is likely to be an issue in whatever claims brought pursuant to § 14(a) of the Exchange Act are ultimately included in plaintiffs' consolidated amended complaint.

5. The merger at issue in National Securities may also be distinguished on another ground. Producers shareholders, as a result of the National Securities defendants' scheme, lost their status as Producers shareholders and became shareholders in a new, different company. Plaintiffs repeat their suggestion that the 1969 Penn Central merger had precisely the same results for Railroad shareholders. How-

ever, the National Securities merger was between two separate corporate entities. Here, although the name and nature of the shareholders' corporation changed as a result of the merger, the 1969 reorganization "was conceived and executed by Railroad through corporations created, staffed and, in effect, owned by Railroad." 347 F.Supp. at 1338. The National Securities merger was therefore a traditional intercorporate merger, while the Penn Central reorganization was not. For reasons discussed at length in our previous Opinion, and which need not be repeated here, the protection of § 10(b) extends to the former but not to the latter.

However, even if approval of the reorganization plan did create a Holding Company entirely free of ICC jurisdiction, we fail to see that that change in the corporate entity required the shareholders to make the kind of significant investment decision which § 10(b) and Rule 10b–5 were designed to protect. Although such a change in ICC oversight could not have been brought about by amending the articles of incorporation, it was nevertheless a change more analogous to the restructuring of an existing corporation than to a cash sale or exchange of shares.

Section 10(b) and Rule 10b–5 were designed by Congress to protect the purity of the process of buying and selling securities and to insure that investors will receive full disclosure of the information they need if they are intelligently to make significant investment decisions. In order to achieve these ends, "Section 10(b) must be read flexibly, not technically and restrictively." Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). This is especially true with respect to interpreting the requirement that to have standing under § 10(b) a plaintiff must have purchased or sold securities, first enunciated in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (C. A.2, 1952), and still the law in actions for damages in this and every other Circuit which has had occasion to pass on the question. See Kahan v. Rosenstiel, 424 F.2d 161 (C.A.3, 1970); Edelman v. Decker, 337 F.Supp. 582 (E.D.Pa.1972); Mount Clemens Industries v. Bell, 464 F.2d 339 (C.A.9, 1972).[6] However, although the terms purchase and sale have, as we discussed in our previous Opinion, been given greatly expanded meanings since Birnbaum, not every corporate act which merely happens to involve transactions in securities is a § 10(b) purchase or sale. A reorganization plan which has the effect of restructuring an existing corporation falls, for reasons we have previously discussed and have elaborated here, outside the scope of the Section and the Rule. Therefore, we reaffirm our conclusion that plaintiffs who were only holders, and not open market purchasers and sellers, of Penn Central stock at the time of 1969 upwards merger do not have standing to sue under § 10(b).

## II. *Section 13(a) of the Exchange Act*

Plaintiffs have not attempted to refute our reasons for concluding that no implied private right of action exists under § 13(a) of the Exchange Act and that § 18(a) is the exclusive remedy for violations of § 13(a). However, they now argue that a private right of action may be implied under § 13(a) because § 18(a) applies only to false and misleading *statements* and does not reach omissions and non-disclosures. Therefore, plaintiffs argue, the same principles of assuring vigorous enforcement of the securities laws and providing broad protection for investors, which have led the courts to imply private rights of action under other sections of the securities acts, should lead us to imply a private right of action in § 13(a). *See, e. g.,* J. I. Case Company v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341 at 356 (C.A.2, 1973). This argument is without merit. The language of § 18(a) shows that it does cover material omissions. The legislative history of the statute removes any doubt on this point. The House Report reporting out the final version of § 18(a) states that the Senate amendment which expressly provided that a "statement", for purposes of § 18(a),

> "shall be construed to include any omission to state a material fact * * * is omitted from the substitute as surplusage in view of the fact that a statement obviously may be misleading because of a material omission." H.R.Rep.No.1838, 73rd Cong. 2d Sess. 36 (1934).

6. *But see* Tully v. Mott Supermarkets, Inc., 337 F.Supp. 834 (D.N.J.1972).

We therefore still hold that § 18(a) is the exclusive remedy for violations of § 13(a), be they the result of statements or of omissions.

### III. *Defendants' Contentions*

#### A. *Sections 10(b) and 9(a) of the Exchange Act*

Defendants contend that the gravamen of plaintiffs' complaints is that defendants' nondisclosures and manipulations maintained the price of Penn Central securities at artificially high levels. Therefore, they argue, a plaintiff who only sold during the relevant period actually benefited from the deceptive practices and will be unable, *a fortiori*, to prove any injury as a result of defendants' conduct. They conclude that summary judgment should therefore be granted as to those plaintiffs. Defendants ground their argument on dicta in Levine v. Seilon, Inc., 439 F.2d 328 (C. A.2, 1971).

We did not reach this point in our previous Opinion, nor did we discuss the applicability of the Levine case, because the pleadings up to that point gave us insufficient information to grant summary judgment on this issue. We continue to think summary judgment an inappropriate means of deciding these points, at least in the current state of the pleadings, and therefore renew our denial of defendants' motion as to plaintiffs who were open market purchasers and sellers during the period of defendants' alleged violations of § 10(b) and § 9(a).

#### B. *Sections 11(a) and 17(a) of the Securities Act*

We agree with defendants that our grant of partial summary judgment should be extended to include those plaintiffs who were only sellers and have sued under §§ 11(a) and 17(a) of the Securities Act. Section 11(a) provides a cause of action for "any person acquiring" securities sold upon a registration statement which contains an untrue statement or omission of a material fact. *See* Barnes v. Osofsky, 373 F.2d 269 (C.

A.2, 1957); Colonial Realty Corp. v. Brunswick Corp., 257 F.Supp. 875 (S.D. N.Y.1966); H.R.Rep.No.85, 73rd Cong., 2d Sess. 9 (1933). Similarly, § 17(a) proscribes certain conduct "in the offer or sale of any securities"; therefore, only purchasers have standing to sue for violations of § 17(a). Simmons v. Wolfson, 428 F.2d 455 (C.A.6, 1970). Neither statute provides for actions by sellers, and we shall therefore amend our August 7 Order to grant defendants' motion for summary judgment as to plaintiffs who were only open market sellers during the period of defendants' alleged violations of § 11(a) and § 17(a) of the Securities Act. Their motion continues to be denied as to plaintiffs who were open market purchasers during this period.