In re PENN CENTRAL SECURITIES LITIGATION, M.D.L. DOCKET NO. 56, Civil Action Nos.: 70–2005; 70–2010; 70–2137; 70–2320; 70–2505; 70–2596; 70–2696; 70–2818; 70–2933; 71–265; 71–266; 71–267; 71–268; 71–277; 71–278; 71–280; 71–476; 71–971

Plaintiff-shareholders in the above-captioned actions, Appellants.

No. 73–1609.

United States Court of Appeals, Third Circuit.

Argued Nov. 26, 1973.

Decided March 14, 1974.

David Berger, Philadelphia, Pa., for appellants.

Raymond K. Denworth, Jr., Drinker, Biddle & Reath, Lewis H. Van Dusen, Jr., Philadelphia, Pa., for appellee.

Before KALODNER, ADAMS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal is another instance of the widespread litigation spawned by the reorganization in bankruptcy of the Penn Central Transportation Company. Appellants, plaintiffs in the district court, have appealed from an order granting partial summary judgment to defendants in the consolidated multidistrict proceedings known as the Penn Central Securities Litigation, which has been assigned to Chief Judge Lord of

the Eastern District of Pennsylvania.[1] The litigation consists of numerous actions brought by shareholders of the Penn Central Company (Holding Company) after its wholly owned railroad subsidiary, the Penn Central Transportation Company (Railroad), filed a petition for reorganization in bankruptcy on June 21, 1970. Defendants include certain companies in the Penn Central complex, a number of their present and former officers and directors, and certain independent accountants. Defendants are alleged to have violated numerous provisions of the securities acts primarily during the period between February 1, 1968, and June 21, 1970.[2]

The actions are predicated upon allegedly false and misleading financial information concerning the Penn Central complex which the defendants prepared, filed with the SEC, or released to the shareholders and the public in an allegedly successful attempt to inflate the market price of Penn Central Company capital stock. Certain defendants are also alleged to have intentionally prepared and distributed false and misleading proxy materials, and to have sold stock on the basis of inside information concerning the deteriorating financial situation of the companies.

On December 6, 1971, the district court granted motions permitting the Trustees in reorganization of the Penn Central Transportation Company, and the Penn Central Company itself, to assert exclusive control over all derivative actions brought by the shareholders. These derivative actions are not before us. We are concerned only with individual causes of action by the plaintiffs.

On May 7, 1971, plaintiffs petitioned for an order declaring that eighteen actions could be maintained as a class action. Defendants cross-petitioned for partial summary judgment on a number of counts of the complaints.

On August 7, 1972, the district court granted partial summary judgment to defendants on the counts, inter alia, at issue on this appeal, and granted class action status to the plaintiffs who had viable causes of action remaining after the decision on summary judgment. 347 F.Supp. 1327 (E.D.Pa.1972). Plaintiffs petitioned for reconsideration and after further briefing and argument, the decision for partial summary judgment was reaffirmed on April 17, 1973. 357 F. Supp. 869 (E.D.Pa.1973). On May 16, 1973, the district court certified that there was no just reason to delay appeal of the order as reaffirmed, and entered final judgment as to those claims for which summary judgment was granted. Fed.R.Civ.Proc. Rule 54(b). We therefore have jurisdiction over these appeals under 28 U.S.C. § 1291. Simmonds Aerocessories v. Elastic Stop Nut Corp., 257 F.2d 485, 489 (3d Cir. 1958).

Plaintiffs contest on this appeal only two issues of law decided by the district court's opinions and orders. First, they appeal the district court's dismissal of claims brought under Section 10(b) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78j(b), as to plaintiffs who did not engage in any open market purchases or sales of stock in the relevant companies during the period of time covered by the complaints. The district court in dismissing these counts rejected plaintiffs' contention that the purchase or sale requirement was met by the 1969 transaction by which persons owning stock in the company later known as the Penn Central Transportation Company exchanged their shares for shares of the Penn Central Company. Second, plaintiffs appeal the dismissal of all counts brought under Section 13(a) of the 1934 Act, 15 U.S.C. § 78m(a). This dismissal was based upon the district court's conclusion that no implied private right of action exists under that section. Since the

---

1. The consolidation order is reported in In re Penn Central Securities Litigation, 322 F. Supp. 1021 (Jud.Pan.Mult.Lit.1971).

2. Among the provisions allegedly violated are §§ 5, 11, and 17(a) of the Securities Act of 1933, and §§ 9, 10(b), 13(a), 14, and 18(a) of the Securities Exchange Act of 1934.

issues involved in the dismissals of the counts under the two sections are distinct, we treat them seriatim.

## I. THE SECTION 10(b) CLAIM

On February 1, 1968, the New York Central Railroad Company merged with the Pennsylvania Railroad Company. The resulting corporation, after a change of name effective May 8, 1968, was known as the Penn Central Company (Railroad). Railroad stock was held directly by individual members of the public.

On April 10, 1969, the Railroad shareholders received proxy materials from the company which sought approval of the formation of a new holding company which would have Railroad as its 100% owned subsidiary. The stockholders would exchange their Railroad shares for shares in the holding company, and they would then own all the shares in the holding company, which in turn would own all the shares of Railroad.

The Railroad shareholders approved this proposal at the annual meeting of Railroad held on May 13, 1969, and the reorganization became effective on October 1, 1969. The newly created railroad subsidiary, formerly known as the Penn Central Company, was renamed the Penn Central Transportation Company (still referred to herein as Railroad). The newly created holding company was named the Penn Central Company (Holding Company).[3] Railroad is the corporation that on June 21, 1970, entered reorganization proceedings pursuant to Section 77 of the Bankruptcy Act.

Among the plaintiffs in this consolidated action are a number who owned Railroad stock on February 1, 1968. They exchanged that stock for Holding Company stock pursuant to the May 1969 corporate reorganization, and continued to hold that Holding Company stock until June 21, 1970. They at no other time during the two year period purchased or sold stock in either of the corporations on the open market. These plaintiffs (as well as other plaintiffs who did engage in open market transactions during the two year period) allege various causes of action against the defendants based upon Section 10(b) of the 1934 Act.[4] Chief Judge Lord granted summary judgment to defendants on all Section 10(b) claims brought by plaintiffs in this category. He based this determination on his findings that the exchange of stock pursuant to the 1969 reorganization was not a "purchase or sale" by these plaintiffs, and therefore they had not alleged fraud "in connection with the purchase or sale of any security."

Plaintiffs contend on this appeal that the reorganization affected several "important basic rights" of the shareholders

3. Actually, the procedure used to consummate this corporate reorganization was considerably more complex than that outlined here. For a complete description of the procedure for consummating the reorganization, see D.C., 335 F.Supp. 1026, 1030–1031.

4. Section 10(b) states:
It shall be unlawful for any person . . . [t]o use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
Rule 10b–5, promulgated pursuant to that section, states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 CFR § 240.10b–5.

and had serious economic consequences to the corporation; therefore, the protection of Section 10(b) should be extended to the share exchange by which the reorganization was consummated. We agree with the excellent analysis of the transaction by Chief Judge Lord and we therefore reject the contention.

■■ We must begin our discussion by noting that this case does not raise the question of the continuing validity of the rule of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.) cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L. Ed. 1356 (1952), that to have standing to bring a 10(b) action the plaintiff must himself have been a purchaser or seller in connection with the fraudulent scheme alleged.[5] Were we to completely eliminate the *Birnbaum* requirement, it would not help plaintiffs in this case. Even if plaintiffs themselves need not be the purchasers or sellers, they must still allege (1) a purchase or sale of securities, and (2) fraud in connection with that purchase or sale of securities. Since our attention is not directed to any alleged purchase or sale of securities other than the share exchange accompanying the reorganization,[6] our inquiry must be centered in any event on whether that exchange brings the transaction within the statutory scope of 10(b). *See* SEC v. National Securities, Inc., 393 U.S. 453, 467 n.9, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969).

■ It is well established that the share exchange accompanying the merger of two separate and distinct corporate entities, pursuant to which shareholders in one or both of the original entities exchange their shares for shares in the surviving or newly created corporation, constitutes a "purchase or sale" bringing the transaction within the scope of 10(b). SEC v. National Securities, Inc., *supra*, 393 U.S. at 464–467, 89 S.Ct. 564, 21 L.Ed.2d 668; Dasho v. Susquehanna Corp., 380 F.2d 262 (7th Cir.) cert. denied sub nom., Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967). In *National Securities, Inc.*, plaintiffs alleged that they were fraudulently induced by misleading proxy statements to vote in favor of a merger between their company, Producers Life Insurance Company, and National Life & Casualty Insurance Co. In holding 10(b) applicable, the Court stated:

> The deception furthered a scheme which resulted in [the plaintiffs] losing their status as shareholders in Producers and becoming shareholders in a new company. Moreover, by voting in favor of the merger, each approving shareholder individually lost any right under Arizona law to obtain an appraisal of his stock and payment for it in cash . . . . Whatever the terms "purchase" and "sale" may mean in other contexts, *here an alleged deception has affected individual shareholders' decisions in a way not unlike that involved in a typical cash sale or share exchange.* The broad antifraud purposes of the statute and the rule would clearly be furthered by their application to this type of situation. Therefore we conclude that Producers' shareholders "purchased" shares in the new company by ex-

---

5. We recently declined to completely eliminate the *Birnbaum* requirement. Landy v. Federal Deposit Insurance Corporation, 486 F.2d 139, 158 (3d Cir. 1973). *Cf.* Eason v. General Motors Acceptance Corp., 490 F.2d 654 (7th Cir. 1973). In *Eason*, plaintiff shareholders had personally guaranteed liabilities of their corporation given in connection with the corporation's purchase of a business. When the business failed and the corporation went bankrupt, plaintiffs were held to have a 10(b) cause of action for fraud against the seller of the business.

6. Although the point is not raised on this appeal, several of the complaints do allege insider selling by defendants which might be considered the "sale" in connection with which fraud occurred. If these are the relevant sales, however, we do not see how plaintiffs could be considered to be "investors and . . . principals in the [sales] transaction" which even the court in *Eason* considered necessary for standing by the plaintiffs in that case. The plaintiffs in this case allege no relationship whatsoever with the insider sales "in connection with" which fraud is alleged.

changing them for their old stock. [Emphasis supplied.]

393 U.S. at 467, 89 S.Ct. at 572.

In such a merger between two corporations, the original shareholders of each corporation end up with stock in a substantially different company with substantially different assets and prospects. The decision to vote in favor of the merger is therefore little different from the decision to sell shares in the original corporation and, with the cash received for those shares, buy shares in the merged corporation. It clearly effectuates the remedial purposes of the securities acts, therefore, to extend their protections to such a share exchange.

■ On the other hand, there are limits to the scope of Section 10(b). The Supreme Court has recognized that "Congress by 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). The Supreme Court, however, went on to say that "[t]he crux of the present case is that [the company represented by the plaintiff] suffered an injury as a result of deceptive practices touching its sale of securities as an investor." 404 U.S. at 12–13, 92 S.Ct. at 169.

■■ The formation of Holding Company is neither the typical merger covered by 10(b) nor the typical internal management decision excluded from the coverage of that section. We must determine, therefore, whether the 1969 reorganization was in effect an "internal corporate management" decision which only incidentally involved an exchange of shares [6a] or in effect a major corporate restructuring requiring the same kind of investment decision by the shareholders as would a proposed merger with a separate existing corporation. We have been cited to no cases, and we have found none,[7] which raise this issue.[8]

**6a.** The fact of the share exchange by itself certainly does not bring the transaction within the scope of 10(b), since such a share exchange may clearly involve no more than internal corporate management. Such an exchange may accompany a stock split, a reverse stock split, creation of one or more new classes of stock, changes in par value of stock, or similar internal corporate action. Plaintiffs contended before the district court that the reorganization was within 10(b) partly because it resulted in new classes of stock, changes in preemptive rights, changes in par value or stated value, and changes in the classes and terms of directors. Although these factors are not emphasized on this appeal, we agree with Chief Judge Lord that these changes are outside the scope of 10(b). See 347 F.Supp. at 1337–1339.

We do not find helpful § 3(a)(14) of the 1934 Act which provides that "the terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of."

**7.** The Second Circuit, in an opinion filed after oral argument in this case, considered the same issue but on significantly different facts. International Controls Corp. v. Vesco, 490 F.2d 1334 (2d Cir. 1974). International Controls Corp. (ICC) had a wholly owned subsidiary, Fairfield Aviation (FA). ICC incorporated Fairfield General (FG) as a wholly-owned subsidiary. At an ICC

board meeting allegedly tainted with fraud, the board approved (1) the transfer of ICC's FA stock to FG in exchange for additional shares of FG stock, and (2) distribution of all the FG stock as a dividend in kind to ICC shareholders.

The court first rejected the contention that the first transaction constituted a "sale" under Section 10(b), since by the "self-dealing" transaction ICC "retained complete control over [FA] and, thus relinquished nothing in the exchange." This first transaction is analogous to the corporate restructuring in the instant case, since ICC, as sole shareholder of FA, in effect created FG as a "holding company" between itself and FA. We do not find the court's holding on this point determinative of the present case, however, because the various rights of individual shareholders are considerably more affected by the formation of a holding company than are the rights of a single 100% owner which adds a new corporate layer between itself and a subsidiary.

The Second Circuit then held, however, that the second transaction, the distribution of a dividend in kind to the ICC shareholders, did constitute a "sale" under Section 10(b).

We do not believe that the holding as to the second transaction controls this case any

Borrowing language of the Court in *National Securities, Inc.*:

> We enter this virgin territory cautiously. The questions presented are narrow ones. They arise in an area where glib generalizations and ·unthinking abstractions are major occupational hazards. Accordingly, in deciding this particular case, remembering what is not involved is as important as determining what is.

393 U.S. at 465, 89 S.Ct. at 571.

Plaintiffs on this appeal focus on three changes in their interests as a result of the 1969 reorganization which they allege bring the transaction within 10(b). They emphasize the concomitant loss of their appraisal rights, their resulting inability to intervene in the bankruptcy proceedings of Railroad, and the opportunities for diversification by Holding Company not previously available to Railroad. We consider in turn the significance of each of these changes.

## A. The Loss of Appraisal Rights

On May 9, 1969, four days before the annual meeting of Railroad at which the reorganization was approved, the board of directors of Railroad elected to have Railroad governed by the Pennsylvania Business Corporation Law (BCL), 15 P. S. § 1001 et seq.[9] This election became effective immediately, and it is not disputed that the BCL provisions were applicable to the reorganization and that the BCL did not provide appraisal rights to dissenting shareholders.[10]

Defendants contend first that the shareholders did not lose appraisal rights as a result of the BCL election because dissenting Railroad shareholders did not have appraisal rights under the statutory scheme which governed up to the time of the BCL election.[11] In view of our decision in this case we need not consider this contention, which goes to the merits of plaintiffs' claims.[12] We agree with defendants, and with Chief Judge Lord, that if the appraisal rights

---

more than does the holding as to the first transaction. Distribution of FG stock from ICC to its shareholders transferred control of FA from ICC to its stockholders and the Second Circuit found that this had significant effects *on ICC*, the allegedly defrauded party. In effect, ICC lost control of the assets held by FA. In the instant case, however, the plaintiff shareholders retained control over the Railroad assets by means of their control over Holding Company, and the remaining issue is whether their rights were otherwise substantially affected.

8. We do not find apposite the cases which have construed the word "sale" in the context of § 16(b) of the 1934 Act, which relates to profits on short-swing sales. SEC v. National Securities, Inc., 393 U.S. at 466, 89 S.Ct. 564, 21 L.Ed.2d 668; International Controls Corp. v. Vesco, *supra*, 490 F.2d at 1344–1345.

9. 15 P.S. § 1004(B)(2) excepts from the coverage of the Business Corporation Law, any corporation, inter alia, incorporated under any other act for a purpose of furnishing railroad transportation, and which has not elected to accept the provisions of the Law in the manner set forth in § 1004(C). The latter section authorizes such acceptance by approval of the board of directors and the appropriate filing with the Depart-

ment of State. The election is effective upon filing.

10. 15 P.S. § 1515 is the only provision of the BCL which grants appraisal rights. § 1515(L) provides, with exceptions not here relevant, that § 1515 does not apply to classes of stock which on the record date are listed on the New York or American stock exchanges (unless provided otherwise in the articles of incorporation or in a resolution by the board of directors submitting the proposed plan to the shareholders). Since Railroad stock was listed on the New York Stock Exchange and the provisos did not apply, Railroad shareholders did not have appraisal rights under the BCL.

11. They argue that because of the special nature of the 1969 reorganization, appraisal rights would not be available under 15 P.S. § 4262 et seq., 15 P.S. § 4272 et seq., 15 P. S. § 4281 et seq., 15 P.S. § 4284 et seq., or 15 P.S. § 801 et seq.

12. Plaintiffs allege that since the BCL election was not made until May 9, 1969, the Proxy Statement dated April 10, 1969, improperly stated that "under applicable Pennsylvania law the Stockholders of Railroad who dissent from the Plan are not entitled to appraisal rights . . . ." The district court also avoided reaching the merits of this claim. 357 F.Supp. at 874–875 & n. 4. *See* p. 539 *infra*.

were lost, the loss was a result of the action by the Board of Directors in electing to come under the BCL and not a result of the reorganization.

■ Plaintiffs have introduced numerous internal corporate documents in an attempt to show that the Railroad directors considered the elimination of dissenters' appraisal rights to be an integral part of the reorganization and an essential prerequisite to the successful consummation of the reorganization. Be that as it may, the consequences of the BCL election by the directors should not be considered in determining whether the exchange of shares pursuant to the reorganization constitutes a "purchase or sale" of a security.

■ Pennsylvania law gives boards of directors of corporations such as Railroad complete authority to elect to come under the provisions of the BCL at any time and thereby leave their shareholders with no appraisal rights. Once the BCL election was made by the board, it became effective immediately and it would have remained in effect regardless of the outcome of the reorganization vote a few days later. The elimination of the appraisal rights had already been concluded and they were unaffected by the subsequent vote. Since the BCL election was irrelevant to their decision on how to vote, the prior elimination of appraisal rights could not have affected the shareholder decision on the reorganization and thereby transformed it into the kind of investment decision involved in the typical merger or sale of stock for cash. On the contrary, the board's BCL election, though admittedly useful or perhaps necessary for a successful reorganization, was essentially an internal management decision outside the scope of Section 10(b). *National Securities, Inc., supra,* does not control both because that case involved a typical merger combining two preexisting corporations and because it was only by voting in favor of the merger that a shareholder in that case lost appraisal rights. In the absence of both of these

factors in the present case, the alleged loss of appraisal rights has little, if any, significance.

### B. Inability to Participate in the Bankruptcy Proceedings

■ As further evidence that the reorganization significantly affected their basic rights and interests, plaintiffs point out that as a result of the formation of Holding Company, they no longer own Railroad stock and therefore they have only limited rights of participation in the Section 77 railroad reorganization proceedings in which Railroad is enmeshed. It is, however, undisputed that Holding Company has full rights of participation in the proceedings.

Section 77(c)(13) of the Bankruptcy Act provides that:

> [A]ny . . . stockholder [of the debtor] . . . shall have the right to be heard on all questions arising in the proceedings, and upon petition therefor and cause shown, any such person or any other interested party may be permitted to intervene.

Furthermore, Section 77(p) provides that approval of the Interstate Commerce Commission is required before anyone may solicit from shareholders of railroads in reorganization proceedings authorization to represent such shareholders in such proceedings. It has been held that intervention in a representative capacity in a reorganization proceeding may only be permitted in accordance with § 77(p). In re Penn Central Transportation Company, 328 F. Supp. 1273, 1275 (E.D.Pa.1971), aff'd, 455 F.2d 976 (3d Cir. 1972).

Plaintiffs have thus been affected doubly and adversely by the reorganization which formed Holding Company. First, as non-shareholders of Railroad they have lost their right to be heard on all matters arising in the proceedings; they must instead appeal to the discretion of the reorganization court to be heard. Second, although they as individuals may be granted intervention for

"cause shown" just as could Railroad shareholders, since they are no longer shareholders of Railroad they apparently cannot combine so that their joint holdings might be sufficient to justify intervention by their representative. *See* In re Penn Central Transportation Company, *supra*, 328 F.Supp. at 1275.

Plaintiffs' loss of these rights is a statutory consequence of the corporate reorganization. Thus, these considerations may justifiably have entered into their decision on whether or not to vote for the reorganization. These considerations, therefore, provide some support for plaintiffs' contention that the reorganization vote was an important investment decision. The weight to be given them depends upon the value a shareholder would reasonably attach to them in determining how to cast his vote on the proposed reorganization, since that is essentially what determines whether these considerations contributed to making the vote a significant investment decision.

Applying this criterion, we believe this loss of rights deserves minimal weight. In view of the inherently limited range of vision of the voting shareholders at that point in time, the bankruptcy of Railroad, while not entirely inconceivable, was a highly remote and speculative contingency. Even if that possibility had perchance momentarily crossed their minds, the shareholders should have known they would control the holding company and their majority view could thereby be heard in the reorganization court. If they were in fact seriously concerned with the possibility of bankruptcy, they should also have known that should they be a minority, they could request the opportunity to be heard or to demonstrate "cause" for intervention.

Although conjectural, it is moreover improbable that any individual shareholder, in casting his vote, considered the conjunction of possible bankruptcy, the possibility of being a minority in fixing Holding Company policy, and the possible inability as a minority to be heard in the reorganization proceedings. We do not believe that a transaction may be considered a "purchase or sale" within the scope of Section 10(b) merely because the passage of time and rapidly changing conditions have transformed an extremely speculative contingency into stark reality.

Almost any internal corporate management decision may have grave consequences for shareholders should they in the future form a minority interest in opposition to management. For example, the elimination of cumulative voting may result in the inability of a group of stockholders to subsequently combine to elect a director to represent their mutual interests. Likewise, the elimination of preemptive rights might, after the subsequent issuance of additional shares to the public, reduce the percentage holdings of a particular group of shareholders so as to require them to post bond in order to bring a derivative suit.

These hypotheticals, however, do not support the proposition that such changes in internal corporate structure necessarily affect the basic stockholder decision on these matters in the same way as would "a typical cash sale or share exchange." On the contrary, they show that internal management decisions themselves may indeed significantly affect shareholders' interests under certain circumstances. Although the shareholders lost their right to appear directly before the reorganization court because of the formation of Holding Company, the loss of the right is an outgrowth of an internal management decision rather than one typically following from a sale of shares or merger of two corporations.[13]

---

13. We note that any weight that is given to the potential loss of shareholders' rights to appear in Section 77 railroad reorganization proceedings would carry over into the non-railroad area. Chapter 10 of the Bankruptcy Act, applicable to non-railroad corporate reorganizations in bankruptcy, has provisions similar to Section 77. Section 206 of the

## C. The Added Potential for Diversification

Plaintiffs argue finally that the reorganization involved significant economic consequences because it enabled the holding company to diversify into non-railroad lines of business. Therefore, they argue, the vote on the reorganization was in reality a choice affecting the essential nature of the stock interest held by plaintiffs.

Before the reorganization, Railroad as a carrier could not issue any securities without first obtaining the approval of the Interstate Commerce Commission. This approval required findings by the Commission that, inter alia, (1) the issuance was compatible with the public interest and consistent with the performance as a common carrier of service to the public, and (2) it would not impair its ability to perform that service. 49 U.S.C. § 20a. Railroad management sought diversification but considered it dubious that the ICC would approve the issuance of securities necessary for corporate acquisitions. Formation of a holding company would open up the possibility that the ICC might decline jurisdiction over the holding company's issuance of securities,[14] and enable its diversification into nonrailroad areas of business.[15]

Defendants agree that the potential for greater flexibility in diversification was a reason for reorganization. They contend, however, that the shareholders were nevertheless not making a significant economic decision by means of their vote because the ultimate decision on whether or not to exempt Holding Company from ICC restrictions would in fact be made by the ICC after the reorganization.

We do not believe this point is well taken. Approval of the reorganization would make Holding Company eligible to seek ICC release from the statutory restrictions, a major objective of the reorganization. This important objective would reasonably have weighed heavily with the shareholders in casting their votes on the reorganization. They would reasonably give it far more significant consideration that the possibility of a dilution of their rights in some vaguely remote future bankruptcy proceedings.

▬ Aside from Holding Company's need for ICC exemption from the statutory restrictions before diversification would be possible, we do not believe that this added potential for diversification brings the reorganization within the scope of the protection of the securities law. Conceding that shareholder approval of the reorganization was essential for diversification, we agree with the district court that the added possibility of diversification was nevertheless in the nature of internal corporate restructuring. In the typical corporation, if the articles of incorporation, in the light of changing economic or competitive conditions, are unduly restrictive and limit diversification, a solution is an

Act permits stockholders of the bankrupt to be heard on any matter arising in the proceeding, while § 207 permits the court for cause shown to allow any "party in interest" to intervene generally or for specified matters. Chapter 10 thus makes the same distinctions between stockholders and non-stockholders of non-railroad bankrupt corporations as does Section 77 for railroads.

14. 49 U.S.C. § 5, par. (3) provides that when a noncarrier acquires control of a carrier pursuant to par. (2) of § 5, "such [noncarrier] shall, to the extent provided by the Commission . . ., be considered as a carrier subject to," inter alia, § 20a as

it relates to the issuance of securities by a carrier.

15. Section 3(a)(6) of the Securities Act of 1933 exempts from coverage of the Act, except as expressly provided, "[a]ny security issued by a common or contract carrier, the issuance of which is subject to the provisions of section 20a of Title 49." Declination of jurisdiction over Holding Company by the ICC would therefore substitute the provisions of the Securities Act of 1933, with its disclosure and other requirements, for the provisions of Title 49, which imposed substantive restrictions on when a carrier may issue securities consistent with the public interest in carrier operations.

amendment to the articles with shareholder approval. *See*, e. g., 15 P.S. § 1801 et seq. Such an amendment would not be in the nature of a "purchase or sale" of stock in one corporation for stock in "another" corporation. The present situation is analogous, differing only because of the special statutory restrictions placed upon railroad diversification.

Although the statutory restrictions make it more cumbersome to achieve diversification, the difficulty does not alter the considerations which enter into the shareholders' voting decision. The proposal presented to them may have been complex but the elements entering into their decision were the same as those typically confronting any shareholder voting on the enlargement of the charter purposes of his corporation. Plaintiffs therefore cannot rely on the possibility of diversification following from approval of the reorganization as a factor which substantially transforms the reorganization into a sale for the purposes of Section 10(b).

■ Chief Judge Lord succinctly summarized the transaction in the following terms:

Although Holding Co. had a full complement of directors and officers who were engaged in activities on behalf of the company before October 1, 1969, and an exchange of shares occurred pursuant to the reorganization, we cannot conclude that the formal characteristics of a traditional merger convert the 1969 reorganization into a merger for the purposes of § 10(b). The purpose of the reorganization was to enable Railroad to embark on a program of diversification into nonrailroad activities through a holding company that would not be subject to regulation by the Interstate Commerce Commission. The reorganization was conceived and executed by Railroad through corporations created, staffed and, in effect, owned by Railroad. These corporations had no assets of their own and were created solely to effectuate a reorganization of Railroad from a single publicly owned corporation into a publicly held holding company and a wholly-owned railroad subsidiary. The result of the reorganization was that an existing corporation was restructured.

347 F.Supp. at 1338. We conclude that the specific changes pointed to by the plaintiffs do not bring the 1969 reorganization within the scope of 10(b).

■ We note, however, that shareholders who do not have a 10(b) cause of action against defendants may nevertheless have a cause of action against defendants for misleading proxy statements under Section 14(a) of the Securities Exchange Act of 1934. The district court denied summary judgment to defendants on several claims brought under § 14(a), 347 F.Supp. at 1340–1342, and this action is not contested on appeal.

## II.  THE SECTION 13(a) CLAIM

Section 13(a) of the Securities Exchange Act of 1934 requires the filing of information, reports and documents with the SEC as required by the rules and regulations of the SEC.[16] Section 18(a) provides that a person making or causing to be made a false statement in

---

16. Section 13(a) provides:

(a) Every issuer of a security registered pursuant to section 12 of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

(1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 12 * * *;

(2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe. * * *

a document filed under any other section of the Act shall be liable for false or misleading material facts to any person who in reliance on such misstatement *purchased or sold a security* at a price affected by such misstatement.[17] The district court granted summary judgment to defendants as to all Section 13(a) claims by all plaintiffs. It accepted defendants' theory that the sole remedy for violations of 13(a) is offered by 18(a), and that therefore there is no implied right of action under 13(a). 347 F.Supp. at 1339–1340, 357 F.Supp. at 876–877.

■ We have not been cited, nor have we found, any appellate decisions concerning the possible existence of a private right of action under 13(a).[18] We believe the district court correctly held that § 18(a) is the exclusive remedy for alleged violations of § 13(a). Acceptance of plaintiffs' argument would result in the elimination of the purchaser-seller requirement for violations of § 13(a), a requirement which this court has recently held essential for standing under the general anti-fraud provision of § 10(b). Landy v. Federal Deposit Insurance Corporation, 486 F.2d 139, 158 (3d Cir. 1973).[19] We have not been cited to any language or to any history in the 1934 Act which indicates that Congress intended to extend the protection offered by § 13(a) beyond the class of purchasers or sellers. We also see no practical basis for creating a cause of action in a shareholder who alleges he relied on an unduly optimistic report in not selling his stock. Were we to do so, we logically should create a right of action in any non-shareholder who alleges he relied upon an unduly pessimistic report in deciding *not to buy* stock of the corporation. As we noted in *Landy, supra,* 486 F.2d at 158, as to section 10(b),

> Were we to extend the provisions of section 10(b) beyond the buyer or seller relationship, we would be judicially extending the terms of the statute and creating new rights. The consequences of the view urged by plaintiffs would establish a new and amorphous body of rights and obligations heretofore unrecognized in federal jurisdiction.

We believe the same considerations also apply to the contention advanced in the instant case that we should imply a pri-

17. Section 18(a) provides:

    (a) Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder * * * which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false and misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. * * *

18. *See* In re Caesar's Palace Securities Litigation, 360 F.Supp. 366, 388 (S.D.N.Y.1973) (denying motion to dismiss § 13 claims without discussion of this issue); DiJulio v. Digicon, Inc., 339 F.Supp. 1284, 1290–1292 (D.Md.1972) (dismissing § 13 claims because plaintiffs purchased stock before alleged vio-

lations); Smith v. Murchison, 310 F.Supp. 1079, 1088 (S.D.N.Y.1970) (calling a private right of action under § 13(a) "very doubtful") (dicta); Kaminsky v. Abrams, 281 F.Supp. 501, 505 (S.D.N.Y.1968) (accepting possibility of private action under § 13) (dicta); Kroese v. Crawford, '61–'64 CCH Fed.Sec.L.Rep. ¶91,262 (S.D.N.Y.1963) (denial of motion to dismiss under § 13(a), upholding private right of action, based on unexplained "history and purposes of the federal securities laws.").

19. Were this court to follow Eason v. General Motors Acceptance Corporation, 490 F.2d 654 (7th Cir. 1973), eliminating the requirement that the plaintiff himself be a purchaser or seller to have a cause of action under 10(b), we would not imply a private right of action into 13(a). A cause of action under § 10(b) would still require a "purchase or sale" of securities, and fraud "in connection with" that purchase or sale. *See* p. 533 *supra*. Section 13(a) itself contains neither of these conditions limiting the possible scope of liability were we to imply a right of action.

vate right of action in section 13(a) to avoid the purchaser-seller requirement of section 18. We therefore decline to do so, at least in the absence of exceptional circumstances which are not present in this case. *See Landy, supra,* 485 F.2d at 158.

The judgment of the district court will be affirmed.